## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **Kimberli Motley-Ivey,** | : | |
| **Plaintiff,** | : | |
| **v.** | : | **Civil Action No. 09-571 (RLW)** |
| **District of Columbia, et. al.** | : | |
| **Defendants.** | : | |

## OPPOSITION TO DEFENDANTS', DISTRICT OF COLUMBIA, ALFRED DURHAM, PAUL NIEPLING AND DALE POSKUS' MOTION FOR SUMMARY JUDGMENT

COMES NOW Plaintiff, Kimberli Motley, through counsel, and in opposition to Defendants' Motion for Summary Judgment states as follows:

1.   Plaintiff's claims under the District of Columbia Human Rights Act are not subject to dismissal because they are timely and meet the requirements of D.C. Code Section 12-309.

2.   Similarly, Plaintiff has exhausted her administrative remedies under Title VII and thus her claims of gender discrimination, hostile work environment, and retaliation should survive summary judgment.

3.   Plaintiff's claims under 42 U.S.C. § 1983 are timely and are supported by the predicate constitutional violation of her Fifth Amendment rights based on Defendants' discriminatory and retaliatory practices.

4.   With respect to Plaintiff's discrimination and retaliation claims, she has suffered adverse employment actions in the form of suspensions without pay, revocation of her police powers, restrictions on her ability to earn overtime and/or outside income, and transfer from the unit where she has served for over 15 years.  Defendants used fabricated disciplinary actions to against Plaintiff based on her gender and so there are genuine disputes of materials facts whether

-2-

Defendants can show that their employment decisions were legitimate and not motivated by discriminatory and retaliatory reasons.

5. The Court is respectfully referred to the Memorandum of Points and Authorities, as well as Statement of Material Disputed Facts in support of this opposition.

WHEREFORE, Plaintiff prays that Defendants' motion for summary judgment be denied in toto.

Respectfully submitted,

/s/  Jeanett P. Henry_____
Jeanett P. Henry, Bar No. 411052
8701 Georgia Avenue; Suite 403
Silver Spring, MD 20910
(301) 562-1340
JHenry2085@aol.com

**_Counsel for Plaintiff_**

Certificate of Service

I hereby certify that on this 14th day of December, 2012 a copy of this Opposition to Defendants' Motion for Summary Judgment, supporting Memorandum,  and Statement of material Disputed Facts, and proposed Order were served electronically on:

David A. Jackson, Esquire
Assistant Attorney General
Office of the Attorney General
441 4th Street, NW, 6 South
Washington, D.C. 20001

/s/  Jeanett P. Henry_____
Jeanett P. Henry

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **Kimberli Motley-Ivey,** | **:** | |
| **Plaintiff,** | **:** | |
| **v.** | **:** | **Civil Action No. 09-571 (RLW)** |
| **District of Columbia, et. al.** | **:** | |
| **Defendants.** | **:** | |

## STATEMENT OF MATERIAL DISPUTED FACTS

Plaintiff, through counsel submits this Statement of Material Disputed Facts in support of her opposition to Defendants' Motion for Summary Judgment:

### The "Good Ole Boy" Culture at the Harbor Patrol Unit

1. Motley was assigned to the Harbor Patrol Unit ("Harbor") of the Special Operations Division ("SOD") in 1995, and soon after she arrived she realized the men did not want a woman there patrolling the waters with them.  (D's Ex. 6, 40:11-41:2).

2. When Assistant Chief Durham arrived at Harbor in Spring, 2000 he too found a "good ole boy network."  (D's Ex. 3, 36:11-15).  At the time,  there were approximately 20 officers assigned at Harbor, Motley being the only female.  (D's Ex. 3, 22:2-11).

3. Within the first year of Durham's arrival at Harbor, the unit got 8 new officers, including Officer Michelle Market, but she remained there for less than a year then transferred elsewhere in MPD.  (D's Ex. 3, 62:16-63:6; D's Ex. 5, 20:15-21:13; D's Ex. 6, 41:16-20).

4. Except for Motley and Market, all the other female officers who have worked at Harbor have done so solely in administrative capacities, answering phones and monitoring the

-2-

radio, while detailed to Harbor for months at a time on limited duty status.  (D's Ex. 5, 15:13-20:14).

5.   When Durham arrived at Harbor, all the men had negative comments about Motley, including that she was selected for her position because she allegedly had a relationship with a lieutenant.  (D's Ex. 3, 29:1-3).

6.   Initially Durham seemed to understand Motley's plight among the all-male cadre, and assured her that she would be treated fairly, but soon she realized that he wanted her to "befriend him in a way that, probably in a sexual way, that I would be taken care of there."  (D's Ex. 6, 25:19-26:2).

7.   Durham was surprised by the length of time Motley was at Harbor and had not gone to any training, so he initially he assured that she received training, but abandoned her during training for dive certification.  (D's Ex. 3, 26:12-15).

8.   Motley failed the dive certification class because during the final exercise that required the participants to team-up, Officer Pratt, her male co-worker, refused to "buddy breathe" with her as required during the exercise, and he could not even put on his equipment at the bottom of the pool, yet he passed.  (D's Ex. 3, 42-46:1-8).

9.   Motley should have been allowed a second opportunity for the "buddy breathe" exercise, but Durham refused to intervene and so she remained not certified for the remainder of his tenure at Harbor.  (D's Ex. 3, 48:4-17).

10.   Motley quickly learned that when she was not friendly to Durham as he wanted her to be, she was harassed and subjected to unwarranted disciplinary actions.  (D's Ex. 6, 32:3-13).

-3-

11.  In December 2003, Officer Ted Anderson accused Motley of leaving the dock during the midnight tour of duty such that he could not locate her when he received a call to attend to a suspicious vehicle, and Durham assigned Poskus to investigate this incident.  (P's Ex. 2)

12.  Poskus had only recently been assigned to Harbor as of September, 2003.  (D's Ex. 5, 8:8-11).

13.  Poskus seemed pleased to be assigned this investigation because, as he remarked to Wendell Cunningham, he (Poskus) would finally be able to break through Motley's "Teflon" exterior for disciplinary action because he would carry it through the end to see who would interfere.  (D's Ex. 2, 6; P's Ex 3, 1-2).

14.  At the conclusion of his investigation, Poskus, with Durham's concurrence, recommended Adverse Action against Motley for "neglect of duty."  (P's Ex. 2)  Motley was found guilty and received a penalty of suspension without pay for 10 working days.  (Id.)  She successfully appealed her case to the DC Office of Employees Appeals, which reversed the agency decision.  (Id., at 10)

15.  The evidence showed a shoddy investigation by Poskus because Officer Anderson knew Motley's whereabouts, did not try to reach her, did not receive the call for assistance that he alleged, and one of the witnesses disputed the accuracy of the statement taken by Sgt. Poskus. (Id., at 4, 6).

16.  In September, 2004 Motley filed a discrimination complaint with the DC Office of Human Rights ("OHR")  and the EEOC, alleging gender discrimination and a hostile work environment since November 2003.  (D's Ex. 19)  She noted in her affidavit that she had filed

-4-

several internal complaints of harassment with her supervisor, Durham, but he took no action against the perpetrators.  (Id.)

17.  On August 7, 2006 the OHR issued a Letter of Determination finding probable cause that Motley had been subjected to a hostile work environment based on her gender.  (D's Ex. 18).

18.  At his March 12, 2010 deposition Durham claimed that within 4 months of his arrival at Harbor he concluded that Motley should not be a member of MPD much less assigned to Harbor, and feels the same currently.  (D's Ex. 3, 32:1-16;68:16-69:19).  He maintains this opinion of Motley and no other officer at Harbor, despite rating her performance "above average" in March, 2004, a few months before his departure from Harbor.  (D's Ex. 3, 71:1-5; 72:10-20; 79-1-9).

19.  When Lt. Niepling began his assignment at Harbor in June, 2005, he observed that Motley's male co-workers did not want to interact with her, but he did nothing to address the situation, effectively continuing the culture there against the unit's sole female officer .  (D's Ex. 4, 10:8-12; 15:5-7; 73:7-22)

20.  A review of a chart of Harbor's discipline evaluations for 2001-2008, shows that Motley has been subjected to and/or disciplined at a rate of more than 10 times her male counterparts.  (D's Ex. 9).

21.  Over this 7-year period, Motley has been cited for at least ten (10) adverse actions, while of her 17 male co-workers only Freeman Martin was cited for adverse action once in 2004. (Id.)

-5-

22.  All of Motley's male co-workers have been disciplined through corrective actions rather than adverse actions, which carry more severe penalties.  (Id.).

23.  Corrective actions are essentially write-ups, beginning with PD 750, dereliction reports, then official reprimand, with the highest form being a letter of prejudice, which remains in an employee's personnel file for two years.  (D's Ex. 5, 51:8-53)

24.  By contrast, adverse actions can result in suspension, fine, reduction in pay, reduction in rank, or termination.  (D's Ex. 5, 51:12-15).  Therefore, the offense charged determines whether the matter will be handled as corrective or adverse action, so the official who does the investigation makes that initial call, subject to approval of superiors.  (D's Ex. 5, 54:11-22).

25.  Since September 2007 Ass. Chief Durham has been second in command to Chief Lanier, assisting her in the day-to-day operations of the MPD, with oversight of patrol operations, including transfers, reassignments of members of the department, and the disciplinary process. (D's Ex. 3, 19:5-23).

26.  Within months after being added to this lawsuit as a party defendant, in February, 2010 Durham directed Commander James Crane to commence adverse action against Motley relating to overtime work she did when Niepling alleged she was on sick leave back in October 2009.  (D's Ex. 3, 75:20-76:4).

**Highlights of Investigations/Disciplinary Actions**

**February 2008 - Investigation re Boat Docking Incident**

-6-

27.  One night in February 2008 Motley had difficulty docking a boat because of weather conditions and mechanical problems.   Hilliard Dean and Robert Grooms watched Motley as she struggled but refused to help her.  When Motley complained to her superiors, Sgt. Armstrong opened an investigation against her claiming she made untruthful statements about the incident, and Niepling concurred with Armstrong's recommendation for adverse action against Motley. (D's Ex. 4, 46-48).

28.  By contrast, Officers Dean and Grooms received corrective action in the form of an official reprimand for their actions.  (P's Ex. 4).

29.  Niepling barred Motley from using that boat again until she received certification from the Coast Guard, and that took about 6 months to arrange.  (Def's Ex. 4, 49:15-18; 76-77; P's Ex. 5).

30.  Motley had used that boat before without complaints from anyone.  (Def's Ex. 4, 50:19-22)

31.  Michael Maiocco of the Coast Guard, who conducted the training in August, 2008 concluded that Motley "did pretty good," and that she "didn't seem to have any trouble handling the boat."  (P's Ex. 5).

**April 2008 - Charge of Willfully Disobeying Orders re Clearing Out Locker (April 2008)**

32.  On the afternoon of April 29, 2008 Sgt. Blevins, with Niepling's approval, ordered Motley to remove her police equipment from 2 lockers in the female locker room so that Linda Fabrie, boat registrar (civilian) and Officer Karen Carr (who was on detail to Harbor) could store personal items.  (D's Ex.11:2).

-7-

33.  After Motley cleared items from one locker, she realized she did not have storage on-site for equipment from the other locker, so she sent an email to Blevins and Neipling seeking guidance where she could store her police equipment so that she could fully comply with the order by the next day.  (P's Ex. 6)

34.  Niepling responded by email to Blevin, noting that he should let Motley "figure it out."  (Id.)  Neither one responded to Motley.  (Id.)  At 9:19 am the next morning, April 30, 2008, Blevin emailed Niepling stating that Motley failed to follow the orders.  (Id.)

35.  Blevin, with Niepling's approval, cited Motley for adverse action for willfully disobeying orders.  (D's Ex. 11:6)

**May 2008 - Conduct Unbecoming**

36.  On May 21, 2008 Poskus submitted (to himself) a written complaint alleging that Motley slandered him and created a "hostile work environment" when on May 17, 2008 she accused him of being late a week before and placing himself on the book as being on time.  (P's Ex.7).

37.  Poskus then proceeded to conduct an investigation of his own complaint by requesting a written statement from Motley about the incident.  (D's Ex. 12:10).  Niepling also participated in the investigation.  (D's Ex. 12:12).

38.  Motley received a Notice of Proposed Action charging her with conduct unbecoming an officer and a final decision issued finding her in violation and imposed a penalty of suspension for 3 work days without pay.  (D's Ex. 12:4-6)

-8-

39.  On January 6, 2009 Chief Lanier granted Motley's appeal and rescinded the adverse action.  (D's Ex. 12:2)

**May 2008 - Charge of Conduct Unbecoming**

40.  In May 2008 Poskus also conducted another investigation wherein he alleged that she failed to perform her assigned duties, and he recommended that she receive an official reprimand.  (P's Ex. 8).

41.  During the investigation Poskus refused to tell Motley the identities of the officers who complained against her.  (Id.)

42.  Following a Commander's Conference, the allegation was classified as not sustained. (Id.).  Niepling conceded that the investigation had discrepancies.  (Id.).

**July , 2008 Order to Remove Electronic Devices**

43.  On July 22, 2008 Niepling issued a written directive to Motley requiring that she remove all electronic devices from the women's locker room no later than 8:00 a.m. the next day. (P's Ex. 9.

44.  Motley followed the directive and removed the electronic devices, including television and radio, which she had in the women's locker room for 14 years.  (P's Ex.9).

45.  On July 28, 2008 union official Wendell Cunningham conducted an inspection of both the women's and men's locker rooms at Harbor.  (P's Ex.  3, p.2).  Officer Cunningham found the men's locker rooms in disarray, with storage all over the locker room of personal items, including TV, radios, bicycles and clothing, and he took photographs.  (Id.).

-9-

**July 2008 - Charge of Neglect of Duty - CIA Assignment**

46.  On July 14, 2008 charging Motley with neglect of duty for having left her CIA detail 3 times for over 3 hours during her shift.  (D's Ex. 10)

47.  Motley responded to the charge by reminding her officials that MPD officers are not allowed in the buildings of the CIA detail, and so she had to leave the detail twice to use the bathroom and once to get a police vehicle.  (D's Ex. 10).

48.  By memorandum dated September 17, 2008, James L. Brunson, Contracting Officer Representative of the National Geo-Spatial Intelligence Agency, confirmed to Commander Crane of SOD that the Navy Yard does not permit access to the facility for "unclear personnel," all MPD members would have to be escorted into the building, and that is why historically MPD officers on the contract have been permitted to use the Harbor Unit  and First District facilities for lunch and bathroom breaks.  (P's Ex. 10).

**November 2008 Performance Evaluation**

49.  On November 13, 2008 Motley received her annual performance evaluation, which had a rating of "does not meet expectations."  (D's Ex. 7).  This level of rating results in the loss of the ratee's next scheduled in-service step increase, and an automatic referral of the ratee for disciplinary action based on a charge of "inefficiency."  (Id.)

50.  The final investigative report for this evaluation appends a plethora of documents on which the rating was based.  (Id.)  Incidents supporting the rating were Motley being under investigation for 3 instances of misconduct, typographical errors in 3 documents over the rating period, unsubstantiated complaint by Officer Carr, and the fact that Motley made a complaint

-10-

that Poskus entered the female locker room unannounced.  (D's Ex. 7, 41, 84, 85, 231-2, 234, 236).

51.  Since Niepling's arrival at Harbor on June 19, 2005 through March 10, 2010 (the date of his deposition), no other officer received a similar rating.  (D's Ex. 4, 71:18-22).

52.  Motley requested that the FOP appeal the unfavorable rating, but the FOP missed the appeal deadline.  (P's Ex. 3, p.2).  Officer Cunningham is confident that, but for the missed deadline, the appeal would have resulted in a change of the rating to a favorable one.  (Id.).

**2009-2010 Overtime (While on Sick Leave) Investigation**

53.  The overtime at issue was 2 hours Motley claimed on her time sheet when on October 24, 2009 she filed with Niepling a PD 42 (injury report) arising out co-worker Grooms intentionally bumping her shoulder two days before as they passed through a doorway.  (D's Ex. 13:6, 12)

54.  Although Motley told Niepling that she was just making a record of the incident, she did not complain of having any pain or that she could not work, and that she actually took the boat out on the water for several hours during her shift that day, Niepling insisted that she go to Providence Hospital for an evaluation.  (D's Ex. 13:8).

55.  Niepling refused to approve Motley's request for payment for 2 hours overtime while she was at Providence Hospital, and so Motley filed a grievance through the union.  (D"s Ex. 13).

56.  Commander Crane of SOD denied Motley's overtime payment and concluded there was no need to open an investigation on the matter because of the Fair Labor Standards Act

-11-

pertaining to compensation of sworn members, would not accomplish anything, and the history

of investigations against Motley "not going anywhere."  (D's Ex. 13:12).

57.  Nevertheless, three months later, on or about February 22, 2010,  Durham directed

that IS numbers be pulled to initiate an investigation against Motley for allegedly working

overtime while on sick leave status.  (D's Ex. 13:12).

58.  During the investigation, Niepling admitted that he had not specifically told Motley

that she was being placed on sick leave when he told her to go to the hospital on October 24,

2009.  (D's Ex. 13:21)

59.  In fact, the applicable General Order contains no language that would automatically

trigger a change in a member's duty status from full duty to sick leave simply because that

member reports an injury.  (D's Ex. 13:20)

60.  Motley was exonerated from the charge of engaging in overtime work while on sick

leave status.  (D's Ex. 13:21)

**July 2010 - Charge of Neglect of Duty re Boat Incident**

61.  In July 2010 an investigation commenced citing Motley with neglect of duty because

while she was docked at the Georgetown Harbor doing a boat check on May 22, 2010, she left

the key in her boat and a civilian boarded the boat.  (D's Ex. 14; D's Ex. 7:90).  Motley arrested

the civilian.  (D's Ex. 7:90)

62.  During the investigation it was discovered that leaving keys in docked boats was

common practice at Harbor as reflected by statements from other officers at Harbor and

photographs Motley took and submitted to the investigator.  (D's Ex. 14:11-23).

-12-

63.  The investigator recommended  that the practice of leaving keys in the ignitions of the patrol boat while unattended (whether at a police facility or not) be changed, and recommended Niepling review and consider photos of MPD boats left unattended with equipment aboard and keys in ignition not at a MPD facility.  (D's Ex. 14:6)

64.  Although Motley's action was commonplace at Harbor, she was found to have neglected police property and suspended without pay for 2 work days, and she was further required to serve another 5 days suspension without pay that had been held in abeyance.  (D's Ex. 14:21).

65.  Three weeks prior to Motley's incident with the boat, Officer Theodore Anderson had a similar incident where a civilian boarded his docked boat and he arrested the person, but Anderson was never subjected to an investigation or any disciplinary action.  (D's Ex. 7:90)

66.  Sgt. Poskus testified in deposition that over his 8 years at Harbor, there has never been a theft of a police boat, and other than Motley no one else at Harbor has ever been disciplined for leaving a key in a patrol boat.  (P's Ex. 11, Poskus 6/7/12 dep., 16:14-17:3).

**September 2010 - Counseling for Violating Chain of Command**

67.  Motley went to Poskus to request permission to do an educational program on the water with children.  (P's Ex. 11, 8:4-9:11).  Poskus conferred with Niepling who denied the request.  (Id., at 9:14-18).

68.  Poskus issued to Motley a PD-62 counseling form claiming that he was ordered to cite Motley for violating the chain of command.  (Id., at 5:14-21).

-13-

69. However, no assistant chief complained to Niepling about Motley violating the chain of command when she made her request.  (D's Ex. 4, 58:22-59:7; 60:14-61:2).

**September, 2010 - Charge of Perjury re Linda Fabrie Incident**

70. On February 17, 2010, civilian employee overheard Motley on the phone telling union rep, Wendell Cunningham, that Mrs. Fabrie's husband (civilian) had the combination to the secured area of the station, and so she got upset.  (P's Ex. 12, Niepling 6/7/12 dep., 24:16-22).

71. Mrs. Fabrie was so irate that she threw a pair of glasses and a pen at Motley as she continued her phone conversation in a hushed voice.  (D's Ex. 15)**.**  Motley and Cunningham terminated their conversation, and then he called Niepling while Motley called for emergency assistance.  (Id.).

72. When Cunningham reached Niepling by phone, he was in his office socializing with his friend, Mr. Fabrie.  (P's Ex. 12, 9:14-10:16; 15:5-18).

73. First District units arrived at Harbor in response to Motley's call. (P's Ex. 12, 13:7-11).  Motley told Niepling that she had called for 1D officers because Mrs. Fabrie assaulted her.  (P's Ex. 12,  11:14-18)

74. Although Motley wanted Ms. Fabrie arrested for assault, Niepling determined there was no probable cause and so she would not be arrested.  (P's Ex. 12, 17:18- 18:16).

75. After the incident Motley and Fabrie continued to work in the same building.  (D's Ex. 15:14)

76. Since Niepling refused the union's several requests to separate Motley and Fabrie, union officials Cunningham and Michael Millette advised Motley to pursue a stay away order at

-14-

the D.C. Superior Court, which she did.  (D's Ex. 15:15)  The hearing was held on March 2, 2010, and Motley's petition for a stay away order was denied. (D's Ex. 15)**.**

77.  In a memorandum dated April 7, 2010 to the Assistant Chief of the Internal Affairs Bureau, Niepling initiated an investigation by accusing Motley of misconduct relating to her court appearance on March 2, 2010.  (P's Ex. 13).

78.  Even though Niepling had not talked to Fabrie's attorney, union officials Cunningham and Millette who were at the court proceeding, or Motley, never reviewed the court transcript of the hearing, and did not know whether Motley lied under oath, he characterized her court testimony as "criminal."  (P's Ex. 12, 31:17-32:19; P's Ex. 13)  He also knew perjury to be intentional lying under oath, and that a sustained charge of perjury would result in Motley's termination.  (P's Ex. 12, 35:1-3, 16-21)

79.  The result was that Motley was served with adverse action papers on September 15, 2010 proposing to terminate her employment; her police powers were revoked, and she was immediately detailed from Harbor to the Command Information Center and ultimately ended up at the Property Division.  (P's Ex. 12, 37:13-22; 38:9-11; P's Ex. 14).

80.  Motley was stripped of her authority to perform any duty requiring the exercise of police powers, and her authority to carry a service weapon and privilege to engage in outside employment and earn additional compensation were revoked.  (P's Ex. 14).

81.  Officer Robert Grooms has had his police powers revoked but remained assigned at Harbor. (D's Ex. 4, 84:13-22).

-15-

82.  The United States Attorney for the District of Columbia reviewed the allegations and declined to prosecute Motley.  (D's Ex. 15:12).

83.  Union officials Cunningham and Millette both testified at the disciplinary panel hearing that like Motley, they did not believe her court appearance was a personal matter but within the scope of her employment since the underlying incident occurred on the job between 2 MPD employees.  (D's Ex. 15:15-16).  Like Motley, they also wore their full uniforms and carried their weapons at the court proceeding.  (Id.)

84.  MPD's disciplinary panel ultimately found that Motley did not perjure herself in Court on March 2, 2010, but violated MPD regulations by wearing her uniform and gun in the courtroom while she was allegedly involved on a personal matter, and recommended her suspension for 10 working days without pay, which she has already served.  (D's Ex. 15:23-25).

**Motley's Permanent Transfer from Harbor**

85.  Niepling testified in deposition that following conclusion of the disciplinary process, a December 2011 teletype ended Motley's detail and she returned to work at the Harbor Patrol. (P's Ex. 12,  39:16-40:6)

86.  The day after Motley returned to Harbor, Ms. Fabrie submitted a memorandum to Niepling  saying she was afraid of Motley and that with Motley at Harbor Fabrie would be working in a "hostile work environment."  (P's Ex. 12, 41:12-42:10).

87.  Fabrie never said Motley did anything to her between March 2, 2010 and September 2010 when Motley was detailed out of Harbor. (P's Ex. 12,. 42:11-15).  The only incident of

-16-

"retaliation" that Fabrie talked about was the altercation in the station in February 2010, and the only threat was to have her arrested for assault. (Id., at 48:18-22; 49:6-9).

88. Within a week of Fabrie's complaint, Motley was detailed to the Special Events Branch initially then a few weeks later to the 4th District where she remains to date. (Id., at 46:16-22; 47:6-15).

**April 2012 Presidential Detail**

89. On April 26, 2012 Motley was served with an Adverse Action again proposing to terminate her employment with MPD due to "inefficiency" for having several disciplinary actions in the past four years, and that she neglected her duty during a Presidential Detail on February 3, 2012. (P's Ex. 15. As before, she was immediately stripped of her police powers and assigned administrative duties. (Id.)

90. The disciplinary actions giving rise to the "inefficiency" charge concerned her alleged failure to clean out her locker in 2008, leaving the key in her boat in 2010, and wearing her uniform and gun during a court proceeding on March 2, 2010. (Id.).

91. Following a hearing on July 17, 2012, Motley was found not guilty as to both charges. (P's Ex. 16.).

Respectfully submitted,

/s/ Jeanett P. Henry_____
Jeanett P. Henry, Bar No. 411052
8701 Georgia Avenue; Suite 403
Silver Spring, MD 20910
(301) 562-1340
JHenry2085@aol.com

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **Kimberli Motley-Ivey,** | : |
| **Plaintiff,** | : |
| **v.** | : **Civil Action No. 09-571 (RLW)** |
| **District of Columbia, et. al.** | : |
| **Defendants.** | : |

_____

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**OPPOSITION TO DEFENDANTS', DISTRICT OF COLUMBIA, ALFRED DURHAM,**
**PAUL NIEPLING AND DALE POSKUS' MOTION FOR SUMMARY JUDGMENT**

COMES NOW Plaintiff, Kimberli Motley, through counsel, and in support of her

Opposition to Defendants' Motion for Summary Judgment states as follows:

**ARGUMENT**

**I.      PLAINTIFF'S DCHRA ARE TIMELY**

**A.      Notice Pursuant to DC Code § 12-309**

Admittedly, Plaintiff sent her 12-309 Notice to the Mayor by letter dated March 14, 2011.

(D's Ex. 17).  However, the notice advised of a continuing pattern of discrimination and

retaliation that has created a hostile work environment at Harbor Patrol Unit ("Harbor") for

Motley since she was first assigned there in or around 1994.  (Id.)  The United States Supreme

Court has noted that incidents constituting a hostile work environment claim "occur over a series

of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may

not be actionable on its own."  *Nat'l. R. R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115,

(2002).  Because these acts may not all occur within the filing period, "[p]rovided that an act

contributing to the claim occurs within the filing period, the entire period of the hostile

-2-

environment may be considered by a court for purposes of determining liability." *Id.,* at 117.
Similarly, when defendants' alleged retaliation toward plaintiff consists of a series of events that
continue over time, claims outside the window can be considered under the continuing violation
theory.

In this lawsuit, Plaintiff brings claims for discrimination, hostile work environment and
retaliation based on a series of incidents that occurred over many years.  Since some of those
incidents occurred in the six month period preceding the filing of the March 14, 2011 Section 12-
309 letter to the Mayor, her claims are timely.  *See e.g., Morgan*, 536 U.S., 122, 122 S. Ct. at
2077  ("A charge alleging a hostile work environment claim ... will not be time barred so long as
all acts which constitute the claim are part of the same unlawful employment practice and at least
one act falls within the time period."); *but  cf Barrett v. Covington & Berling, LLP*, 979 A.2d
1239, 1248 (D.C. 2009) ("A reasonable accommodation claim [under the DCHRA] is based on
discrete acts, not on prolonged or repeated conduct.")

With respect to the intentional infliction of emotional distress claim, D.C. Code § 12-309
does not require the specificity demanded by Defendants in the notice letter, i.e. identification of
the precise legal theory upon which a plaintiff seeks relief.  *See Shaw v. District of Columbia*,
2006 WL 1274765 (D.D.C. May 8, 2006) (The statute itself is completely devoid of an explicit
requirement that a potential plaintiff provide DC with the specific cause-of-action to be asserted
in possible future litigation).  Ultimately, when faced with a 12-309 dispute, courts "implicitly
follow a case-by-case approach in an area where 'no bright' line tests are applicable." *Pitts v.
District of Columbia*, 391 A.2d 803, 808 (D.C. 1978); *Mazloum v. DC MPD*, 522 F.Supp.2d 24

-3-

(D.D.C. 2007) ("the content requirements of the notice given to the District …. are to be interpreted liberally, and in close cases [courts are to] resolve doubts in favor of finding compliance with the statute."  Thus Plaintiff's IIED claim in this lawsuit is not barred because she was not required to name specifically the claim in the March 2011 notice letter, and defendants were already embroiled in this lawsuit that has included an IIED claim since the first amended complaint.

While the District is now arguing vigorously for dismissal of Plaintiff's claims under Section 12-309, the District does not actually recognize the necessity for this type of notice for employment discrimination claims, as reflected in the March 24, 2011 response from the Office of Risk Management.  (P's Ex. 1).  As the response advises, the notice will only be recorded as received, and the file closed without any investigation - the whole premise behind the notice requirement.  (Id.)

### B.  Statute of Limitation

As argued in the previous section, Plaintiff's claims are covered by the continuing violation theory and/or require a series of acts over a period of time to make out the claim, such as for hostile work environment.  Therefore, provided one of the acts constituting the claim occurs within the one year window under the DCHRA, Plaintiff's claims are timely.  Since Plaintiff's initial complaint filed on March 26, 2009 includes incidents in the preceding year, her claims are also timely for incidents preceding March 26, 2008.  *Vickers v. Powell*, 493 F.3d 186 (C.A.D.C. 2007)(US Court of Appeals reinstated Title VII hostile environment claim because the

-4-

action constituted a "continuing violation" even though the most egregious actions supporting the claim occurred eight years before the charge was filed).

### C.   Election of Remedies

While Plaintiff filed a discrimination complaint with OHR on September 20, 2004 and cross-filed with the EEOC.  (D's Ex. 19).  On August 7, 2006 the OHR issued a Letter of Determination finding *probable cause* that Motley was subjected to a hostile work environment based on her gender.  (Id., at 11). This Letter of Determination does not constitute a finding on the merits to trigger the election of remedies because the analysis ended with plaintiff's *prima facie* case, and the OHR invited the parties to conciliation before the final determination, which would be through a summary determination or a hearing before an independent hearing examiner.  (Id.)  No conciliation was held, and the OHR then failed to take the next step to conclude the case on the merits through summary determination or a hearing.

Apparently, after the probable cause finding OHR deferred any further action to EEOC under their work sharing agreement, and EEOC ultimately issued its Notice of Right to Sue on December 30, 2008.  Plaintiff's complaint filed on March 26, 2009 was within 90 days of the Notice of Right to Sue.  When Plaintiff filed her complaint in this court OHR still had not issued a final agency action.  *See D.C. Code § 2-1403.16.*  Under the circumstances, Plaintiff's elected course for remedy is through the courts, and thus even her claims preceding August 7, 2006 should survive summary judgment.

-5-

## II.     PLAINTIFF EXHAUSTED HER ADMINISTRATIVE REMEDIES FOR HER TITLE VII CLAIMS

The standard for deciding whether an employment discrimination plaintiff exhausted her administrative remedies is whether the theory actually relied on at trial was like or reasonably related to the allegations of the EEOC charge.  *See e.g. D.C. Code §2-1401.01, et seq.; Ivey v. District of Columbia*, 949 A.2d 607 (D.C. 2008) (EEOC claim alleging gender discrimination had all facts necessary to make out a claim under the DCHRA for personal appearance discrimination, which related back to her original EEOC complaint and was timely); *Lazuran v. Kemp*, 142 F.R.D. 466, 468-70 (W.D.Wash. 1991)(allowing plaintiff whose EEOC complaint only alleged sex and race discrimination to proceed in court on theory of national-origin discrimination based on facts alleged in the original EEOC complaint).

Motley's September 20, 2004 charge with EEOC addressed a continuing pattern of harassment dating back to September, 2001 with an incident in November 2003 being the most recent at the time for purposes of the continuing harassment claim.  (D's Ex. 19).  In each of her subsequent charges, Plaintiff pleads that the new filing was a "continuing action," and the EEOC charging document does not have a separate box for hostile work environment claim, which in this case is encompassed within the box checked for discrimination based on sex.  Regardless, based on the case law Plaintiff's retaliation and hostile work environment claims were properly exhausted because they arise out of the same series of events specifically alleged in the charging document and thus relate back to each of the EEOC filings.  Therefore, Plaintiff's retaliation and hostile work environment claims are timely and summary judgment should be denied.

-6-

### III.     PLAINTIFF'S 42 U.S.C. § 1983 ARE TIMELY

As previously argued, Plaintiff's hostile work environment and retaliation claims are

based on a series of incidents that occurred over several years.  So long as at least one of the acts

that contributed to the hostile work environment occurs within the filing period, other acts that

also contributed to the claim but did not occur within the filing period may be considered.  *See*

*Nat'l R.R. Passenger Corp. v. Morgan.*  These unconstitutional practices were so "permanent and

well settled" at the Harbor Patrol as to constitute a "custom or usage" for purposes of Plaintiff's

due process claims under 42 U.S.C. § 1983.   Accordingly incidents preceding March 26, 2006

are encompassed within Plaintiff's Section 1983 claim, are timely, and should survive summary

judgment.

### IV.     DEFENDANTS' SUBJECTED PLAINTIFF TO A HOSTILE WORK
### ENVIRONMENT BASED ON HER GENDER

In their quest for summary judgment on Plaintiff's hostile work environment claim,

defendants completely ignore their use of unjustified disciplinary actions to create a hostile work

environment for Plaintiff in the hopes that she would voluntarily quit, request a transfer, or her

employment involuntarily terminated for cause.  The process was immaterial, as long as they got

her out of Harbor so that they could restore the unit to an all male cadre - the "ole boy network."

After all, the only other female officer who was ever assigned to the unit in the past 15 years was

Michelle Market, who remained at Harbor for less than a year then transferred elsewhere in

MPD.  (Statement of Material Disputed Facts, ¶3.  (hereafter "SOF, ¶"___")

The perception around Harbor was that Motley could not have received such an

assignment without having used her femininity.  In fact the shop talk was that Motley got

assigned to Harbor because she allegedly had a relationship with a lieutenant.  SOF, ¶ 6.  As a

result, then Harbor Master Durham (now Assistant Chief) was willing to ease the way for her at

Harbor but only if she were willing to have a sexual relationship with them.  Indeed, during her

encounters with Durham at Harbor, he related to her in such a way that Motley felt he wanted her

to "befriend him in  a way that, probably in a sexual way, that I would be taken care of there."

SOF, ¶ 6.  But when Durham realized that Motley would not accede to his desires, he sided with

the "good ole boys", and she was subjected to a sustained pattern of unjustified disciplinary

actions, which kept her in constant fear of losing her job.  As union official Wendell

Cunningham observed in his affidavit, "I have seen the toll all the disciplinary actions have taken

on her emotionally and physically, including weight changes and hair loss.  I am surprised she

has not had a nervous breakdown by now."  (P.'s Ex. 3, ¶8).

   Unjustified disciplinary action against Motley was continuous, concerted and pervasive.

It appears that other than a few months here or there, over the past 10 years Motley was always

engaged in defending herself against alleged misconduct  For example, between 2001 and 2008

Motley has been subjected to and/or disciplined at a rate of more than 10 times her male

counterparts.  (D's Ex. 9).  On the disciplinary chart, Motley has 34 entries, but the male officer

with the most entries had only 7.  (Id.)  The preferred method of citing Motley for discipline was

adverse action, which exposed her to suspensions without pay and termination, while the

preferred method for the men has been corrective action, a mere write-up.  (Id.)  During this

period of time, Motley received 10 adverse actions while of her 17 male co-workers only

Freeman Martin was cited for adverse action once in 2004.  (Id.)

-8-

In 2008 alone Motley was charged with allegedly making untruthful statements (February), willfully disobeying orders to clear out lockers (April), two instances of conduct unbecoming (May), neglect of duty (July), and she ended the year with a performance evaluation with a rating of "does not meet expectations," (November) which led to her automatic referral for disciplinary action based on a charge of "inefficiency." (SOF, ¶¶27-52).  Some of these investigations ran over into 2009

Similarly, 201 was quite active in that Motley was charged with working overtime while on sick leave (February), neglect of duty (July), violating the chain of command (September) perjury with the recommendation for termination (September).  SOF, ¶¶ 53-84).  The perjury charge resulted in automatic strip of Motley's authority to perform any duty requiring the exercise of police powers, and her duty to carry a service weapon and privilege to engage in outside employment were revoked.  (SOF, ¶ 80).  She was also immediately transferred from Harbor perform administrative duties at the property Division of MPD where she remained over a year (September 2010 through December 2011) when she was found not guilty of the perjury charges.  (SOF, ¶ 84).  Within days of Motley's return to Harbor in early December, 2011 Motley was detailed to the Special Events Branch then the Fourth District where she remains to date.  (SOF, ¶ 88).

As recently as April 26, 2012 Motley was served with adverse action proposing to terminate her employment for "inefficiency" and neglect of duty during a Presidential detail. (SOF, ¶ 89).  Again she was stripped of her police powers and placed on administrative duties. (Id.).  Following a hearing on July 17, 2012, Motley was found not guilty as to both charges.

-9-

(SOF, ¶ 91).  So the "good ole boys" have finally gotten Motley out of Harbor, but her termination from the department is still a quest.  After all, Durham, Chief Lanier's second in command, has disciplinary actions under his purview.  (SOF, ¶ 25).

The sheer volume of the disciplinary actions against Motley demonstrates the pervasiveness of the hostile work environment, and should preclude summary judgment.

## V.   PLAINTIFF'S DISCRIMINATION AND RETALIATION CLAIMS SURVIVE SUMMARY JUDGMENT

### A.   Plaintiff was Subject to Adverse Employment Actions

Plaintiff was subjected to adverse action for her unjustified disciplinary actions.  For example, the 2003 charge for neglect of duty resulted in Motley being suspended for 10 working days without pay, which she served long before the OEA overturned the agency decision (SOF, ¶ 14).   For the July 2008 charge of neglect of duty, Motley was removed from the CIA detail and lost overtime opportunities.  As a result of the November 2008 Performance Evaluation that scored Motley as "does not meet expectations," Motley lost her next scheduled in-service step increase because this rating was not overturned because the FOP missed the deadline.  (SOF, ¶49).  For the July 2010 charge of neglect of duty, Motley was suspended without pay for 2 work days and she was further required to serve another 5 days without pay that had been held in abeyance.  (SOF, ¶ 64).   The September 2010 charges, which included charges relating to Motley wearing her police uniform and gun in a courtroom during her efforts to obtain a stay order against Linda Fabrie, resulted in Motley being stripped of her police powers, transferred from Harbor to the Property Division for over a year to do administrative tasks, and she received suspension of 10 working days without pay.  (SOF, ¶¶ 79-80, 84).  Finally the April 2012

-10-

charges arising out of the Presidential detail, Motley was stripped of her police powers, lost

overtime opportunities, and assigned administrative duties.  (SOF, ¶ 89).

**B.  Defendants' Employment Actions Against Motley Were Pretext for Discrimination and Retaliation**

Many of the disciplinary actions against Plaintiff were:  (a)  fabricated (2003 neglect of

duty, April 2008 charge for willfully failing to clear out locker, May 2008 conduct unbecoming,

both charges, September 2010 counseling for allegedly violating the chain of command,

September 2010 perjury charges ) or (b) she was disciplined more severely than her male

counterparts (2008 incident when she sought help with docking her boat and she was cited for

adverse action while Dean and Grooms received official reprimands  , or (c) she was disciplined

for acts that her male counterparts were never disciplined even though they engaged in similar

alleged misconduct-(July 2008 charge of neglect at CIA assignment, July 2010 charge of neglect

of duty because she left her key in the boat while docked at the Georgetown Harbor).  Motley's

2008 performance evaluation was also a farce because the rating was predicated on the

unjustified disciplinary actions and incidents ruled unsubstantiated.  Motley was found not guilty

of the charges relating to the Presidential detail.

Accordingly, there is no basis for summary judgment on the discrimination and

retaliation claims.

**VI.    MOTLEY'S SECTION 1983 CLAIM ALSO SURVIVES SUMMARY JUDGMENT**

In the preceding discussion, Plaintiff has established "a predicate constitutional

violation," i.e., discrimination, hostile work environment, and retaliation based on her gender.

-11-

The custom that pervaded the Harbor Unit is that it had been and should be restored to an all

male unit.  To accomplish this goal, the supervisors bombarded Motley with unjustified

disciplinary actions, and treated her starkly different from her male counterparts for over 15

years.  This practice had become so widespread and embedded that Chief Lanier must have

known and sanctioned it, especially given that her second in command is defendant Durham.

Therefore, there is no grounds to dismiss the section 1983 claim.

## CONCLUSION

For the foregoing reasons, defendants' motion should be denied in toto.

Respectfully submitted,

/s/  Jeanett P. Henry_____
Jeanett P. Henry, Bar No. 411052
8701 Georgia Avenue; Suite 403
Silver Spring, MD 20910
(301) 562-1340
JHenry2085@aol.com

***Counsel for Plaintiff***

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **Kimberli Motley-Ivey,** | **:** | |
| **Plaintiff,** | **:** | |
| **v.** | **:** | **Civil Action No. 09-571 (RLW)** |
| **District of Columbia, et. al.** | **:** | |
| **Defendants.** | **:** | |

_____

**ORDER**

Upon consideration of Defendants' Motion for Summary Judgment, Plaintiff's opposition thereto, and the record of the case, it is this ____ day of _____, 20139, by the United States District Court for the District of Columbia,

ORDERED, that the motion is hereby DENIED.


                              _____
                              ROBERT L. WILKINS
                              United States District Judge