Notice: This decision may be formally revised before it is published in the *District of Columbia Register*. Parties should promptly notify the Administrative Assistant of any formal errors so that this Office can correct them before publishing the decision. This notice is not intended to provide an opportunity for a substantive challenge to the decision.

THE DISTRICT OF COLUMBIA

BEFORE

THE OFFICE OF EMPLOYEE APPEALS

| | |
|---|---|
| In the Matter of: ) | |
| KIMBERLI IVEY ) | OEA Matter No. 1601-0144-04 |
| Employee ) | |
| ) | Date of Issuance: December 2, 2005 |
| v. ) | |
| ) | |
| DISTRICT OF COLUMBIA ) | Lois Hochhauser, Esq. |
| METROPOLITAN POLICE ) | Administrative Judge |
| DEPARTMENT ) | |
| Agency ) | |

Don Johnson, Esq., Employee Representative[1]
Mark Viehmeyer, Esq., Agency Representative

## INITIAL DECISION

### INTRODUCTION AND STATEMENT OF FACTS

In this petition, dated July 6, 2004, Employee appeals Agency's final decision of June 9, 2004 to suspend her for ten days. At the time of the adverse action, Employee was in a full-time permanent status and had been employed by Agency as a police officer for ten years. She was assigned to the Harbor Patrol Unit.

The matter was assigned to this Administrative Judge on or about February 1, 2005. The pre-hearing conference was held on March 1, 2005. The Hearing took place on June 14, 2005. At the Hearing, the parties were given the opportunity to, and did in fact, present both

---

[1] Anthony Motley appeared with Mr. Johnson on behalf of Employee at the hearing.

documentary and testimonial evidence[2] as well as arguments. The parties were notified of the availability of the transcript on October 14, 2005 and were directed to submit written closing arguments by November 14, 2005. At the request of Employee, and with the consent of Agency, the deadline was extended until November 28, 2005. Submissions were made in a timely manner. The record closed on November 28, 2005.

## JURISDICTION

The Office has jurisdiction in this matter pursuant to D.C. Official Code § 1-606.03 (2001).

## ISSUES

Did Agency meet its burden of proof regarding its imposition of a ten day suspension?

## FINDINGS OF FACT, ANALYSIS AND CONCLUSIONS

On April 14, 2004, Agency issued a "Notice of Proposed Adverse Action" in which it proposed suspending Employee for ten working days, based on the following:

Charge No. 1: Violation of General Order Series 1202, Number 1, Part I-B-14, which reads in part: "Neglect of any duty to which assigned or required by rules and regulations adopted from time to time by the department". This misconduct is defined as a cause in Section 1603 of the District of Columbia Personnel Manual.

Specification No. 1: In that on Friday, December 5, 2003, while on duty working the midnight tour of duty at the Special Operations Division, Harbor Branch, you left the dock watch between 0000 and 0030 hours. You did not return [sic] 0430 hours. At 0420 hours, Officer Ted Anderson received a call for a suspicious vessel under the 11th Street Bridge. When Officer Anderson attempted to notify you that he had to leave to investigate the matter, he was unable to contact you after making several attempts to do so. Officer Anderson had to contact the dispatcher to request a unit from the First District to man the station. Your disappearance was investigated by Sergeant Dale Poskus of the

---

[2] Witnesses testified under oath. The transcript of this proceeding is cited as "Tr" followed by the volume and page numbers. Exhibits (Ex) introduced by Agency are cited as "A" followed by the exhibit number. Those introduced by Employee are cited as "E" followed by the exhibit number.

Harbor Patrol Branch, upon his arrival for the day work tour. This investigation revealed that between the hours of 0100 and 0430, you were inside of the D.C. Fire Boat trailer. While in the trailer, you were witnessed to be watching television and sleeping by employees of the D.C. Fire Department.

The Harbor Patrol Unit is responsible for handling suspicious activities and for other law enforcement duties that often require immediate action. At the time, the Unit was housed in a trailer with lights and a telephone. The Fire Department (DCFD) also had a unit located in trailers at the end of the pier, approximately 125 feet from the MPD facility. Officers assigned to the Harbor Unit had several ways to contact each other. If they had the other officer's number, they could use Nextel. Alternatively, they could page the officer by telephone through an intercom system within the building. The third way was to use Harbor Marine Radio Channel 17. The fourth means of communication, an intercom system outside the building, was not working.

Dale Poskus, who investigated the incident that resulted in the adverse action, testified that the investigation was initiated based on a report filed by Officer Theodore Anderson, Jr., who was assigned on the midnight shift tour-of-duty as was Employee on December 5, 2005. Officer Anderson submitted a report that he received a telephone call from MPD Dispatcher Number 238 regarding a suspicious vehicle on the 11th Street bridge, at about 4:20 a.m. that morning, and contacted First District to cover the Unit while he investigated. There was no mention of Employee in the report and since she was assigned with him, an investigation was initiated. (Exs A-1, A-8). With regard to the MPD station, the witness stated that "nobody really hung out in there". (Tr, p. 12). Sergeant Poskus stated that since Officer Anderson did not have Employee's number on his Nextel, he (Anderson) paged her. When he did not receive a response, he told the witness he contacted the First District and asked that someone cover the Unit while he responded to the call. The witness did not know why he did not ask Officer Anderson during the investigation why he did not use Channel 17, but agreed that he should have asked him. (Tr, p. 29). Sergeant Poskus stated he did not verify with the dispatcher that a call had been made to Harbor Patrol at that time and did not check the dispatcher tape. (Tr, p. 32).

In addition to interviewing Employee and Officer Anderson, Sergeant Poskus also interviewed three firefighters assigned to the harbor unit since Employee stated she had gone to the DCFD trailer that night. (Exs A-2- A-6). He stated one of the firefighters, i.e., David Depetrio, told him Employee had been watching television in the trailer and fell asleep. (Tr, p. 18). He stated that another firefighter, Richard Shaffer, told him Employee "possibly dozed off". (Tr, p. 20). Sergeant Poskus testified he interviewed Employee who told him that "she possibly dozed off". (Tr, p. 21, Ex A-7).

Officer Anderson testified that Employee was not in the MPD trailer when he received a call from the MPD dispatcher regarding a suspicious vehicle at about 4:00 a.m. (Tr, p. 42). He estimated Employee had left the trailer at the beginning of the tour, approximately midnight or 12:30 a.m., and he had not seen her since. (Tr, p. 42). He testified she did not tell him where she was going, but told him to contact her if something happened. (Tr, p. 43).

Officer Anderson stated after receiving the call, he first attempted to contact Employee by Nextel, but when he scrolled through his Nextel, he did not have her telephone number, so he could not contact her through Nextel. (Tr, p. 64). Officer Anderson did not know why Employee's number was not on his Nextel. He stated he then tried paging her in the building, which had been gutted out. (Tr, p. 68). He did not attempt to use Marine Channel Number 17 to reach her because he did not want to broadcast on a radio that "everyone had access to". (Tr, p. 69). He testified that in hindsight, he could have done that. (Tr, p. 69). He thought there was a paging system, called SNAP, available to him, but did not testify that he used it. (Tr, p. 70). He stated he could not recall if there was a clipboard with the telephone numbers of the Harbor Unit officers available on December 5. (Tr, p. 59). He testified he did not contact the Fire Department Unit because "it wasn't a fire-related run". (Tr, p. 71). He said he looked for her outside, but did not recall if he saw her vehicle. (Tr, pp. 43-44). When he was unable to reach Employee, Officer Anderson stated he contacted First District to have someone cover the Unit while he responded to the call. (Tr, p. 48).

The witness testified that when he was returning from the boat after completing the call, he saw Employee at the top of the boat ramp. He stated she asked him why he had not attempted to contact her. He testified he told her "I thought I had you on my Nextel, but it turned out I didn't. But it's okay, I handled the assignment". (Tr, p. 53). Officer Anderson testified that it was common practice for MPD and DCFD staff to visit each other's trailers. (Tr, p. 74).

Assistant Marine Pilot Richard Shaffer testified that he is employed by DCFD and assigned to the harbor. He stated that he was working on December 5 with Officers Depetrio and VonBrezen, and that at some time between 2:00 a.m. and 3:45 a.m., Employee was sitting next to him in the DCFD trailer. (Tr, p. 89). He stated that when they saw a police boat returning to the pier, Employee left. He stated it is a common practice of MPD and DCFD officers to visit in the other's trailers. Officer Shaffer stated that to the best of his knowledge, he did not see Employee asleep during that time. (Tr, p. 92). He disputed the accuracy of the statement taken by Sgt. Poskus. (Tr, p. 93). He said that he did not mean that she was sleeping when he stated she was "resting her eyes":

Well, I do the same thing . . . So, at 3:00 or 4:00 in the morning, sitting in a blackened room with a large TV on, it's not uncommon just to probably do as I'm doing in here now. I have no evidence she ever fell asleep. Nothing led me to believe she was sleeping. (Tr, p. 96)

He added: "I do not think she was asleep. And I am strong in the belief that they did not contact her." (Tr, p. 99).

Assistant Marine Engineer David Depetrio testified that Employee arrived at the DCFD trailer before 1:00 a.m. on December 5 and that she was still there when he went to sleep at 3:45 a.m.. He testified he spoke with Employee and watched television with her and that she then "appeared to be resting" in that she was sitting in the recliner with her eyes closed. (Tr, p. 106). The witness stated he did not know "for sure" if she was asleep, but that her eyes were closed. (Tr, p. 111).

Lieutenant Steven VonBrezen testified he was awake when Employee came to the DCFD trailer and spoke with her for a few minutes and that he then went to sleep.

Karen Carr, an MPD officer, testified she was at the MPD Harbor station between approximately 10:45 p.m. on December 4 and 1:00 a.m. on December 5 using the computer and that Officer Anderson was the only officer there. She testified Employee came in briefly while she was there, and she did not hear Employee tell Officer Anderson where she was going. (Tr, p. 126). She stated she was assigned to Harbor for several years and it was common practice for MPD and DCFD officers to visit the other's trailers. Officer Carr testified that if she needed to contact a Harbor Unit officer she would use her Nextel. If she could not reach the officer by Nextel, she would use Channel 17. (Tr, p. 143).

Steven Porreco, MPD lieutenant assigned to the Disciplinary Review Division, testified he was familiar with the facts in this matter and that his office recommended the ten day suspension. He stated the penalty was consistent with recommendations made for similar offenses.

Francesca Barnes, an MPD officer, testified that every telephone call that comes into MPD is recorded. (Tr, p. 169). She reviewed the dispatch tape and stated that there was nothing on the tape indicating that Officer Anderson received a dispatch from MPD. She also stated there would be a record if MPD had received a call regarding a suspicious vehicle or if MPD had notified Officer Anderson of the call, but that no such record exists. (Tr, pp. 166-167). However, she noted that if the call was made directly to the Harbor unit, it would not be recorded by the Office of the Unified Communications Center. (Tr, p. 170).

Debbie Knotts, an expert for the MPD Computerized Aided Dispatch (CAD) Report System, explained how telephone calls for request for police response are recorded. She stated each call generates a report. She testified that there was no record of a call generated consistent with Officer Anderson's report. (Tr, p. 173). She agreed that if the information was not entered into the system, the record of the report could not be generated, but stated that she was unaware of any instance where information was not entered. (Tr, pp. (Tr, p. 175, 177). She stated that in reviewing all the records pertinent to this matter, the only record generated was Officer Anderson's request for relief from the First District. (Tr, p. 176).

Wendell Cunningham testified he was a Shop Steward and back up diver at the time of the incident. He stated he was familiar with the Harbor Unit at the time, noting that during the summer time he is detailed there. He stated he was surprised Sergeant Poskus was assigned to investigate the matter since Poskus had only been assigned to the Harbor Unit a few months at the time. (Tr, p. 184). He also stated that while he was Shop Steward, Sgt. Poskus had told him he had "heard about [Employee] in the Harbor Unit, that every time someone tries to write her up, she's like Teflon . . . And that this time, he's going to make sure this case goes all the way through and take it to the end to see who is going to interfere with this wave to find out where the problem is, who is interfering with the investigation or something to that effect". (Tr, p. 180).

With regard to the manner in which Employee was treated, he testified he had:

witnessed [Employee] disrespected by a lot of the people down there at the Harbor unit, including Ted Anderson. I've personally seen it and . . . to me, it's sickening to my guts to see it . . . I've actually witnessed it several times and how they actually treat the officer (Tr, pp. 183-184).

He testified he did not report Officer Anderson's treatment of Employee, but he had encouraged her to document and report it. He stated : "She didn't feel like being retaliated against from what she has told me. I tell her, you're absolutely crazy. From what I have seen, and what has happened down here in this Harbor Unit, they don't treat anybody else the way they treat her. They treat her like trash." (Tr, p. 185).

When asked to explain what he meant when he testified Employee was treated "like trash" he stated:

Answer: Well basically, just like you and I are speaking now. They would speak to, the officers would speak to you and I just the same way in tone of voice. When she comes around and starts speaking to them in a nice voice, they would tell her to shut up, shut the hell up, F. this

and stuff like that . . .

Question: And who would do that?

Answer: Ted Anderson was one of them. There was another sergeant . . . And I could not even understand why they were doing that.

A lot of these officers down at the Harbor unit, like I said, since I've been detailed there, she had actually been around, these brand new officers, who have come from different districts, who have been transferred to the Harbor Unit, and they'll treat her nice. But as soon as they see some of the officers speaking to her, the way they speak to her, immediately their tone of voice also switched and [they] start speaking to her the same way.

They talk to her like, get the hell away from me. Shut the hell up. And all those types of words come out of their mouths left and right. I mean, I've never seen it like that before at all since I've been detailed to Harbor until I witness that.

Question: And you witnessed it how many times?

Answer: At least a good five, six, seven times or more with no problem at all. During the summer time, especially when I'm down there, in the summer time, because I'm also a diver and I've been trained by them. (Tr, pp. 190-191).

Officer Cunningham did not think that Employee qualified as a diver. He recalled that she went through training with him and remembered a situation where partners were required to share air. He explained that it was a "haze day" where trainers wanted to see how trainees reacted under water in a stressful situation so the trainees' tanks were shut off, and everything was thrown in the water. The trainees would "have to basically buddy breathing together and share the equipment while...putting on [their] original equipment. He vaguely recalled that the officer assigned with Employee "didn't want her to share the body breathing together". He thought that might have disqualified her from being a diver. (Tr, p. 193).

Employee did not testify at the hearing. However her statement to Sergeant Poskus was entered into evidence. (Ex A-8). She stated that at about 11:00 p.m., when she was going to check on the boats, she asked Officer Anderson if he had her Nextel and when he replied affirmatively, he asked him to call her if he needed her. She said that after cleaning, starting and checking the boats, she went to the Fire Department Unit. She said she had her Nextel and was close to the radio and on the pier. She said Officer Anderson did not contact her. However, she heard him on Marine Channel 17 when he returned to the pier, and went to him

and asked why he had not contacted her. He replied that he did not have her number on the Nextel. She questioned why Officer Anderson did not look for her number on the clip board on the wall that has everyone's telephone number. She also questioned why Officer Anderson had not contacted the Fire Department Unit since its assistance could have been important when responding to a "suspicious" vehicle. (Ex A-8).

Pursuant to OEA Rule 629.3, 46 D.C. Reg. 9317 (1999), an agency has the burden of proof in adverse action appeals. OEA Rule 629.1 requires that the burden be met by "a preponderance of the evidence", which is defined as "[t]hat degree of relevant evidence which a reasonable mind, considering the record as a whole, would accept as sufficient to find a contested fact more probably true than untrue". Employee is charged with "neglect of any duty to which assigned or required by rules and regulations adopted from time to time by the department." She is specifically charged with leaving her dock watch, not being available when Officer Anderson attempted to contact her, and watching television and being asleep inside of the D.C. Fire Boat trailer.

This case relies in large part on assessing the credibility of witnesses. It is within the province of an administrative judge to make important credibility determinations by assessing the demeanor of a witness, the character of the testimony, the self-interest of the witness, and the existence and nature of supporting documentation. *Dell v. Department of Employment Services*, 499 A.2d 102 (D.C. 1985).

It is important to focus on what the issue is in this case. Allegations were made and evidence was presented that Officer Anderson did not really receive a call alerting him about a suspicious vehicle. However, whether Officer Anderson actually received the call is not at issue. Employee is charged with neglecting her duty. The duty did not change even if Officer Anderson was found not to have received a call. The only issue to be resolved in this matter is whether Employee neglected her duty.

In its charge, Agency included several components: that Employee left her duty station; that Officer Anderson was unable to reach her; and that she had been "witnessed to be watching television and sleeping by employees of the D.C. Fire Department." With regard to the first element, there was ample evidence presented by all the witnesses that it was a longstanding practice for MPD and DCFD officers to visit each other, and that it was common practice to find an MPD officer at the D.C. Fire Boat trailer. Therefore, Employee's mere presence there would not constitute neglect of duty. Second, Employee is charged with not being available when Officer Anderson attempted to contact her. Officer Anderson does not dispute Employee's statement that she asked him to contact her by Nextel if he needed her.[3]

---

[3] The Administrative Judge notes that employee's statement was not taken under oath, and therefore, if

His testimony that he scrolled through his Nextel and did not find her number on it appears to support Employee's statement that she asked him to contact her on Nextel. Officer Anderson did not attempt to utilize the clipboard that contained the telephone numbers of MPD Harbor Unit employees, since he did not know if it was available on that morning. Despite the wealth of evidence that MPD officers regularly went to the DCFD site, Officer Anderson made no attempt to contact Employee there and specifically did not contact DCFD to notify them of the call. Although this case is about Employee's alleged neglect of duty and not Officer Anderson's efforts to contact her, the Administrative Judge finds that the evidence supports the conclusion that even if Employee did not tell Officer Anderson where she was going, they did agree that he would contact her by Nextel. There is no evidence that he refused to do so or told her he did not have her number. In her undisputed statement, she contends she was available by Nextel the entire time she was at the DCFD trailer. Employee is not charged with failing to advise Officer Anderson where she would be or with leaving the MPD site and going to the DCFD trailer, but rather she is charged with being unable to be located when needed. However, given the undisputed evidence that MPD officers often stayed at the DCFD trailer which was in close proximity to the MPD site on the pier, and given the finding that the parties agreed Officer Anderson would contact Employee by Nextel, Employee would not have neglected her duty if she was available to be contacted. Once Officer Anderson was unable to reach Employee through the agreed-upon method, because he did not have her number on his Nextel and did not try to access it from the clipboard, there was some duty to contact her in a way that was reasonably calculated to reach her. Despite the plethora of evidence that as an MPD employee, it was at least reasonable if not likely she was at the DCFD trailer, Officer Anderson made efforts to reach her, he stated, by shouting or paging her in a vacant building.

The final allegation is that Employee was watching television or was asleep. There was evidence presented that Employee was watching television during this time, and that she may have been resting her eyes. However, the three DCFD officers, the only individuals who saw her during this period of time, disputed the statements taken by Sergeant Poskus in which they stated Employee was asleep. Not one testified that he saw her asleep.

It is troubling that in its charge Agency characterized Employee's absence from post as a "disappearance", when the evidence revealed that Employee was at the DCFD trailer, which was a common practice for MPD officers. There was no evidence presented that Employee neglected her duty by going to the DCFD trailer. There was no evidence that any effort was made to locate her at the one site that was the most reasonable place to locate her. The burden was not on Officer Anderson to locate Employee. However, since Employee reasonably believed that Officer Anderson would contact her by Nextel and since Officer Anderson

---

disputed, it would not be given much weight.

realized after the fact that he did not have her number, there was a duty to try to locate her if her assistance was needed. There was no explanation why no effort was made to contact her at the one location that was in closest proximity and the most likely location for an MPD officer assigned to the Harbor Unit. Based on a careful review of the documentary and testimonial evidence presented in this matter, the Administrative Judge concludes that Agency did not meet its burden of proof in this matter. If Employee had been asleep, the effort to contact her could not have been successful, but the Administrative Judge concludes there was insufficient evidence presented that she was asleep. There was no evidence presented to contradict her statement that she was available to report if contacted. Since Agency did not meet its burden of proof that Employee was not available because she "disappeared" or was asleep, its action of suspending Employee for ten days cannot be sustained.

## ORDER

It is hereby ORDERED that:

1. Agency's action suspending for ten days is REVERSED; and

2. Agency reimburse Employee all pay and benefits lost as a result of its action; and

3. Agency file with this Office documents showing compliance with the terms of this Order within 30 days of the date on which this decision becomes final.

FOR THE OFFICE:

*Lois Hochhauser / DH*
LOIS HOCHHAUSER, Esq.
Administrative Judge

## NOTICE OF APPEAL RIGHTS

This is an initial decision that will become a final decision of the Office of Employee Appeals unless either party to this proceeding files a petition for review with the Office. A petition for review must be filed within thirty-five (35) calendar days, including holidays and weekends, of the issuance date of the initial decision in this case.

All petitions for review must set forth objections to the initial decision and establish that:

1. New and material evidence is available that, despite due diligence, was not available when the record was closed;
2. The decision of the presiding official is based on an erroneous interpretation of statute, regulation or policy;
3. The findings of the presiding official are not based on substantial evidence; or
4. The initial decision did not address all the issues of law and fact properly raised in the appeal.

All petitions for review should be supported by references to applicable laws or regulations and make specific reference to the record. The petition for review, containing a certificate of service, must be filed with the Administrative Assistant, D.C. Office of Employee Appeals, 717- 14th Street, N.W., 3rd Floor, Washington, D.C. 20004. Four (4) copies of the petition for review must be filed.

Parties wishing to respond to a petition for review must file their response not later than thirty-five (35) calendar days, including holidays and weekends, after the filing of the petition for review.

Instead of filing a petition for review with the Office, either party may file a **petition for review** in the Superior Court of the District of Columbia within 30 days after service of formal notice of the final decision to be reviewed or within 30 days after the decision to be reviewed becomes a final decision under applicable statute or agency rules, whichever is later. To file a petition for review with the Superior Court, the petitioning party should consult Superior Court Civil Procedure Rules, XV. Agency Review, Rule 1.

## CERTIFICATE OF SERVICE

I certify that the attached **INITIAL DECISION** was sent by regular mail this day to:

Kimberli Ivey
604 Juneberry Ct.
Bowie, MD 20721

Don Johnson, Esq.
7002 Dreams Way Ct.
Alexandria, VA 22315

Mark Viehmeyer, Esq.
Office of the General Counsel-MPD
300 Indiana Ave, NW
Room 4125, Municipal Center
Washington, DC 20001

Katrina Hill
Clerk

<u>December 2, 2005</u>
Date