**Page 1**

```
         United States District Court
           for the District of Columbia

Kimberli Motley-Ivey,        )
         Plaintiff,          )
    v.                       ) Civil Action No.
District of Columbia,        ) 09-00571 (RMC)
    et al.                   )
         Defendants.         )
- - - - - - - - - - - - - - -)
                    Washington, D.C.
                    June 7, 2012
```

Deposition of DALE POSKUS, a witness herein, called for examination by counsel for the Plaintiff in the above-entitled matter, pursuant to Notice, the witness being duly sworn by SHARON L. BANKS, a Notary Public in and for the District of Columbia, taken at the Office of the Attorney General for the District of Columbia, One Judiciary Square, 441-4th Street, N.W., Suite 600-South, Washington, D.C. 20001 at 12:05 p.m., Thursday, June 7, 2012, and the proceedings being taken down by Stenotype by SHARON L. BANKS, and transcribed under her direction.

**Page 2**

1  APPEARANCES:
2  On behalf of the Plaintiff:
3     JEANETT P. HENRY, ESQ.
4     Law Offices of Jeanett P. Henry, LLC
5     8701 Georgia Avenue
6     Suite 403
7     Silver Spring, Maryland 20910
8
9  On behalf of the Defendants:
10    DAVID JACKSON, ESQ.
11    Office of the Attorney General
12    for the District of Columbia
13    One Judicial Square
14    441-4th Street, N.W.
15    Suite 600-South
16    Washington, D.C. 20001

P's Ex. 11

**Page 3**

1                C-O-N-T-E-N-T-S
2
3  WITNESS:              EXAMINATION BY COUNSEL FOR
4  DALE POSKUS                   PLAINTIFF
5  By Ms. Henry                     4

**Page 4**

1                P-R-O-C-E-E-D-I-N-G-S
2  Thereupon,
3                     DALE POSKUS
4  was called as a witness and, after being duly sworn by
5  the notary, was examined and testified as follows:
6          EXAMINATION BY COUNSEL FOR PLAINTIFF
7              BY MS. HENRY:
8     Q. Good afternoon, Sergeant Poskus.
9     A. Hello.
10    Q. As you know, I am Jeanett Henry. And I represent
11 Officer Motley in this lawsuit that she has filed
12 against the District of Columbia, you, and other
13 officers. And you will recall that we first met in
14 deposition back in March of 2010?
15    A. Yes.
16    Q. Do you need me to repeat the instructions that I
17 did then?
18    A. No.
19    Q. Okay. All right. You were here for the latter
20 part of Lieutenant Niepling's deposition, correct?
21    A. Yes.
22    Q. And you heard a discussion I was having with

## Page 5

1  Lieutenant Niepling about a 62E that was issued to
2  Officer Motley in or around September 2010 implementing
3  some communication that she had concerning education on
4  the water for children?
5  A. Yes.
6  Q. Do you recall that?
7  A. Yes.
8  Q. Are you familiar with that particular incident or
9  disciplinary action?
10 A. It is not disciplinary action.
11 Q. Okay.
12 A. A PD-62 is just a counseling form. It is not
13 discipline.
14 Q. Okay. Are you the one who issued that to Officer
15 Motley?
16 A. Yes.
17 Q. And why don't you explain to me the circumstances
18 surrounding that?
19 A. I was ordered by Captain Henry to issue Officer
20 Motley a PD-62E counseling documentation form for her
21 violating the chain of command.
22 Q. And how did Captain Henry communicate this to

## Page 6

1  you?
2  A. By e-mail.
3  Q. And what is your understanding of how Officer
4  Motley violated the chain of command in that
5  circumstance?
6  A. I believe she sent an e-mail to probably Captain
7  Henry, Commander Burton, and the assistant chief. I
8  think it was Chief Burke. But I am not 100 percent
9  sure.
10 Q. The assistant chief?
11 A. The assistant chief. Pat Burke, B-u-r-k-e.
12 Q. And?
13 A. And it didn't make them happy, put it that way.
14 Q. What specifically was Captain Henry upset
15 about --
16         MR. JACKSON: Objection.
17         BY MS. HENRY:
18 Q. -- based on any communication you had with him?
19 A. The police department is a paramilitary
20 organization. An example would be if I wanted to get
21 something done, I don't go to the captain. I first go
22 to my lieutenant. In Officer Motley's case, I am

## Page 7

1  assuming she went above me, above the lieutenant. And
2  she went to the captain, to the commander, and to an
3  assistant chief. And in Captain Henry's eyes, she
4  should not have done that.
5  Q. Do you know what it is that Officer Motley was
6  asking or seeking?
7  A. She was seeking, I guess, permission to do some
8  interaction with some children relating to water.
9  Q. And the communication to Commander Burton and the
10 Assistant Chief Captain Burke, did you have an
11 opportunity to review that communication?
12 A. I think I may have been included in some of the
13 e-mails, yes, not communication downwards; just upward.
14 In other words, I don't know what the chief said to the
15 commander. I don't know what the commander said to the
16 captain. All I know is what Captain Henry told me to do
17 was give her documentation.
18 Q. So that's communication downward, you are talking
19 about?
20 A. Yes.
21 Q. Before your receipt of the e-mail from Captain
22 Henry, had you seen the communication that was at issue

## Page 8

1  with Officer Motley?
2  A. Yes.
3  Q. Is that something that you had received?
4  A. I believe Officer Motley e-mailed me a proposal
5  to do something with the children, and then I asked the
6  lieutenant can she do this.
7  Q. So I think what I am confused about -- so Officer
8  Motley e-mailed you a proposal for this education
9  activity with the children, correct?
10 A. Yes.
11 Q. And you were conferring with Lieutenant Niepling?
12 A. Yeah. I didn't act on it without his permission,
13 so I have to seek his permission.
14 Q. Right. And so this communication with Commander
15 Burton and Assistant Chief Burke, was that something
16 separate from Officer Motley's communication with you to
17 this proposal?
18 A. I don't know if it was separate or if everybody's
19 name was included in the e-mail. I am not 100 percent
20 sure.
21 Q. But you are the one she came to with the
22 proposal, correct?

### Page 13

1  A. Not specifically. She just doesn't feel safe, I
2  guess, based on whatever happened between the two of
3  them.
4  Q. And the whatever happened is that incident in
5  February of 2010?
6  A. I would assume so, yes.
7  Q. Are you aware of any other incidents between
8  Officer Motley and Ms. Fabrie other than that February
9  2010 incident?
10  A. Not right now, no. I can't think of any.
11  Q. Other than telling you that she doesn't feel safe
12  in the building with Officer Motley, had Ms. Fabrie
13  talked with you about any other concerns that she may
14  have with Officer Motley?
15  A. Not to me.
16  Q. I don't know if you were here when I was talking
17  with Lieutenant Niepling about an incident where Officer
18  Motley was charged with leaving her key in her boat.
19  A. I was here, yes.
20  Q. You were here?
21  A. Yes, ma'am.
22  Q. And my understanding is that that incident

### Page 14

1  occurred back in May of 2010. Were you aware of that?
2  A. After the fact, yes. I don't think I was working
3  that day.
4  Q. And from whom did you learn about it?
5  A. I don't remember.
6  Q. What did you learn?
7  A. Basically, that Officer Motley was in Georgetown,
8  and she left her keys in her boat. And I think that
9  some female was trying to take her boat.
10  Q. Did you learn what Officer Motley was doing at
11  the time?
12  A. No.
13  Q. Was it your understanding that the female was
14  arrested?
15  A. No.
16  Q. Do other officers leave their keys in their boat?
17  A. No.
18  Q. Not leave them at the Harbor facility?
    A. No. They leave the keys in the boats at work,
20  but the lieutenant says there is a fence around the
21  property. They have cameras. And every boat is
22  different. It is not like a car. You can't just start

### Page 15

1  up a boat. You have batteries that are throughout the
2  boat. Most boats have two or three batteries. You have
3  to know how to turn them on. You have to know where
4  they are. So somebody can't just go jump on one of our
5  boats and start it up and drive away. It is not that
6  easy. So we leave the keys in the boat. And the reason
7  we leave the keys in the boat -- and it's a secure
8  facility -- is in case I get a run and, say, my boat
9  doesn't start. I might have to jump on Officer Motley's
10  boat. So I need to know that the keys are in the
11  ignition.
12  Q. So the type of boat that you were just referring
13  with the batteries here or there, was that the type of
14  boat Officer Motley was operating during that May 22,
15  2010, incident?
16  A. Yes. Her batteries would be in a spot where the
17  public wouldn't normally see them. She would know where
18  they were. Anybody else that worked at the Harbor would
19  know. But an ordinary citizen doesn't know how to turn
20  the batteries on.
21  Q. So they wouldn't be able to move the boat. Is
22  that what you are saying?

### Page 16

1  A. If the keys are in ignition, yes, because when
2  you got off your boat in Georgetown, I am assuming that
3  she did not turn her batteries off. Nobody turns their
4  batteries off when they just get off the boat for a
5  little while. The only time we turn our batteries off
6  is at the end of the tour of duty.
7  Q. But if she had turned her battery off, you are
8  saying that it would be a difficult --
9  A. If she had turned her batteries off, it would
10  make it more difficult, yes.
11  Q. How long have you been at the Harbor Patrol Unit,
12  Sergeant Poskus?
13  A. Probably about eight years.
14  Q. And during your eight years at the Harbor Patrol
15  Unit, has there ever been a theft of a boat?
16  A. A theft of a police boat?
17  Q. Yeah.
18  A. No, not to my knowledge.
19  Q. Is it your understanding that Officer Motley was
20  disciplined for that incident for driving the boat?
21  A. I just found out today.
22  Q. Are you aware of anybody else at the Harbor

17

1  Patrol who was being disciplined for any incidents
2  involving leaving a key in a boat?
3     A. **Not to my knowledge.**
       Q. Did you ever hear that Lieutenant Crawford had
5  recommended a change in the policy regarding maintaining
6  keys and those sorts of things in boats?
7     A. **No. And I would not have agreed to it, either.**
8     Q. What?
9     A. **I am assuming -- are you saying that he would**
10 **tell us to take the keys out of boats?**
11    Q. No, I don't know.
12    A. **Because if that's what you are getting to, we**
13 **don't want to take the keys out of the boat because,**
14 **like I said, with the batteries in a secured facility,**
15 **it would be detrimental if we took the keys out of the**
16 **boats while they are at Harbor Patrol.**
17    Q. To your knowledge, at that time back in May of
18 2010, was there a specific policy that related to
19 removing your keys from the boat?
20    A. **As long as I have been there, I think there has**
21 **been a policy don't leave the keys in the boat if it is**
22 **tied up to a public dock.**

18

1     Q. And your recollection is that the policy was that
2  specific?
3     A. **I am assuming, yes.**
4     Q. What do you mean you are assuming? Do you know
5  or --
6     A. **I am assuming that there is a policy that has**
7  **been there the whole time, yes.**
8     Q. Do you recall actually seeing such a policy?
9     A. **Not when I first got there, no.**
10    Q. Have you since seen such a policy?
11    A. **Yes.**
12    Q. When?
13    A. **I think the lieutenant reiterated it since**
14 **Officer Motley left her keys in her boat.**
15    Q. When you say he reiterated, you are talking about
16 in a written memo?
17    A. **Yes.**
18    Q. Prior to that written memo, were you aware of
   something else in writing?
20    A. **No.**
21       MS. HENRY: Let's go off the record briefly.
22       (A recess was held.)

19

1       MS. HENRY: Sergeant Poskus, those are all
2  the questions I have for you. Thank you very much.
3       THE WITNESS: You are welcome.
4       MR. JACKSON: Do you want to read or do you
5  want to waive the reading and signing?
6       THE WITNESS: Refresh my memory.
7       MR. JACKSON: You are going to get a copy of
8  the transcript. And just look it over and make sure the
9  names are spelled right, dates are correct. You can't
10 change the substance of your testimony. So you are
11 basically just editing the court reporter's record.
12      THE WITNESS: That's fine.
13      MR. JACKSON: We will waive.
14      (Signature was waived.)
15      (At 12:30 p.m., the deposition was
16 concluded.)