## Page 1

United States District Court
for the District of Columbia

Kimberli Motley-Ivey,         )
        Plaintiff,            )
v.                            ) Civil Action No.
District of Columbia,         ) 09-00571 (RMC)
et al.                        )
        Defendants.           )
- - - - - - - - - - - - - - -)

Washington, D.C.
June 7, 2012

Deposition of LIEUTENANT PAUL NIEPLING, a witness herein, called for examination by counsel for the Plaintiff in the above-entitled matter, pursuant to Notice, the witness being duly sworn by SHARON L. BANKS, a Notary Public in and for the District of Columbia, taken at the Office of the Attorney General for the District of Columbia, One Judiciary Square, 441-4th Street, N.W., Suite 600-South, Washington, D.C. 20001 at 10:00 a.m., Thursday, June 7, 2012, and the proceedings being taken down by Stenotype by SHARON L. BANKS, and transcribed under her direction.

## Page 2

APPEARANCES:

On behalf of the Plaintiff:

JEANETT P. HENRY, ESQ.
Law Offices of Jeanett P. Henry, LLC
8701 Georgia Avenue
Suite 403
Silver Spring, Maryland 20910

On behalf of the Defendants:

DAVID JACKSON, ESQ.
Office of the Attorney General
for the District of Columbia
One Judicial Square
441-4th Street, N.W.
Suite 600-South
Washington, D.C. 20001

ALSO PRESENT:
DALE POSKUS

P's Ex. 12

## Page 3

C-O-N-T-E-N-T-S

WITNESS:              EXAMINATION BY COUNSEL FOR
LT. PAUL NIEPLING          PLAINTIFF
By Ms. Henry                  4

E-X-H-I-B-I-T-S
NO.         IDENT.
1           8
2           44

## Page 4

P-R-O-C-E-E-D-I-N-G-S

Thereupon,

LIEUTENANT PAUL NIEPLING
was called as a witness and, after being duly sworn by the notary, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFF
BY MS. HENRY:

Q. Good morning, Lieutenant Niepling.

A. Good morning.

Q. As you know, I am Jeanett Henry. And I represent Officer Motley in this lawsuit that has been filed against the District of Columbia, you, and some other officers. Now, we were last here on March 10, 2010, for your deposition. Do you remember at the beginning of the deposition I gave you some instructions?

A. That was a long time ago. That was March 2010?

Q. Yes, it was 2010. Okay. Well, as you may remember from that deposition, a deposition is a question and answer period. And so I am the one who will be asking you questions, and you will provide answers to my questions. If I ask a question that's unclear to you, you need to let me know so I can clarify

**Page 5**

1  it, because if you don't, once you begin your response,
2  I am going to assume that you understood the question
3  and the answer you are giving me is your best answer to
4  that question.
5       If you need to take a break -- I won't anticipate
6  this will be an entirely long deposition; and we already
7  anticipate that we may be taking a break to accommodate
8  your counsel -- just let me know. However, if we are
9  going to take a break, if there is a question pending, I
10 will require that you answer the question, then we take
11 a break.
12      As you can see, there is a court reporter. And
13 she is taking down everything that's being said.
14 Therefore, all of your responses must be verbal, because
15 she will not be able to record the head shakes that
16 sometimes accompanies discussions. Also, in order for
17 us to have a clear transcript, allow me to finish my
18 question before you begin your response. And I will do
19 likewise and allow you to finish your response before I
20 begin the next question, because also in the course of
21 discussion or question and answer, people tend to talk
22 over each other at times. And sometimes we can't avoid

**Page 6**

1  it, but we will do our best so that we have a clear
2  transcript.
3       Now, you are the commander of the Harbor Patrol?
4  A.  I am the commanding officer.
5  Q.  And does that mean you are the highest official
6  at the Harbor Patrol?
7  A.  Yes.
8  Q.  And just briefly, what are your duties and
9  responsibilities in this position?
10 A.  I am the -- I am responsible for overall
11 management of the Harbor Patrol Unit, all the personnel,
12 budget, equipment, inventory.
13 Q.  And how long have you been in this position?
14 A.  Since 2005.
15 Q.  And prior to that, you were in some other
16 position at the Harbor Patrol?
17 A.  No. Prior to that, I was assigned to the
18 Executive Office of the Assistant Chief.
19 Q.  Who was the assistant chief at that time?
20 A.  Michael Fitzgerald.
21 Q.  Now, as part of your duties as commanding officer
22 at the Harbor Patrol Unit what, if any, responsibilities

**Page 7**

1  did you have in terms of disciplinary actions of
2  officers under your command?
3  A.  The only responsibility I have disciplinary-wise
4  would be making recommendations in the higher chain of
5  command. So I am responsible for the investigations of
6  misconduct with recommendations up through my chain of
7  command.
8  Q.  I want to turn to a couple of investigations and
9  recommendations for disciplinary action that were lodged
10 against my client Officer Motley since 2010. And so the
11 first one I want to start with is one that came out of
12 an incident involving Officer Motley and Ms. Linda
13 Fabrie. Are you familiar with that one?
14 A.  Yes, I am.
15 Q.  And my understanding is there was an actual
16 incident at the Harbor Patrol work site on February 17,
17 2010, between Officer Motley and Ms. Fabrie. Is that
18 your understanding?
19 A.  I can't be exact on the date but, yeah, there was
20 an incident.
21 Q.  Around that time period, correct?
22 A.  I am assuming, yes. Actually, I don't know if

**Page 8**

1  that time line is correct, because you are saying that I
2  gave a deposition in 2010?
3  Q.  Uh-huh.
4  A.  It might have been 2011, actually, for the
5  deposition. I am kind of confused on that.
6  Q.  Okay. The deposition was 2010. I just looked at
7  it this morning.
8  A.  Then I am confused.
9  Q.  What are you confused about?
10 A.  On the dates, because I thought the incident that
11 you were referring to with Ms. Fabrie that was within a
12 month of the deposition?
13 Q.  Yes.
14 A.  Okay.
15 Q.  Well, I could have you look at something to
16 refresh your recollection.
17 A.  Okay.
18 Q.  Why don't we look --
19      MS. HENRY: I will have this marked as
20 Exhibit 1.
21      (Plaintiff's Exhibit No. 1, marked for
22 identification.)

9

BY MS. HENRY:

Q. Lieutenant Niepling, I am showing you what has been marked as Plaintiff's Exhibit 1. It is a two-page document, dated April 7, 2010. And if you turn to the second page, I believe it is showing that it is authored by you; is that correct?

A. That's correct.

Q. Why don't you take a few minutes to review and see if you can put the time line in context so we both are agreeable on that time line.

A. Well, I agree with this time line. I just didn't realize I gave the deposition in 2010. I thought it was just last year. That's all.

Q. Okay. All right. So on February 17, 2010, which is the date we have established as the incident involving Ms. Linda Fabrie and Officer Motley, were you at work that day?

A. Yes, I was.

Q. How did the incident first come to your attention?

A. I recall Officer Wendell Cunningham talking to me on the telephone stating that there was an issue between

10

Ms. Fabrie and Officer Motley.

Q. Did Officer Cunningham call you?

A. Yes, I think he -- I think Officer Motley transferred the call back to me. I was in my office.

Q. Now, where -- at the time, where was your office in reference to Ms. Linda Fabrie's office?

A. They are both at the Harbor Patrol facility. Her office is at the very front of the building. Mine is about mid-building back. The door is separating the two of us.

Q. Okay. So after you say Officer Motley transferred a call from Officer Cunningham to you, tell me what you recall transpiring in that conversation.

A. He said that there was an incident involving the civilian employee Ms. Fabrie and Officer Motley -- an altercation up front -- and that I needed to handle it. And I went up front, and that's when I encountered Officer Motley. And Ms. Fabrie was up there. Officer Motley was sitting down at the desk on the telephone. And Ms. Fabrie was yelling, upset, crying saying she was going to quit her job and she couldn't take this anymore.

11

Q. Did Ms. Fabrie tell you why she was going to quit her job or why she was upset?

A. Yes, she was upset and, you know, yelling. And she was just physically upset. You could just see her crying. And I couldn't really get a whole lot out of her because she was so hysterical. So I told her to go toward the back toward my office and sit down and calm down back there so I could try to figure out what was going on.

Q. Okay. And did she follow your instruction?

A. Yes.

Q. So Ms. Fabrie went to the back as you instructed her to do. And what happened next?

A. Then I tried to ask Officer Motley what was happening. And she, from what I recall, said she had called a 1033 or she was calling for the First District officers to assist her because she said that she was assaulted by Ms. Fabrie.

Q. Did she tell you the specifics of what constituted the assault?

A. No. She was on the telephone with somebody. And every time I asked her a question, I couldn't get an

12

answer out of her. She was talking to somebody else.

Q. Could you tell who she was talking to, whether it was a dispatcher or somebody?

A. No.

Q. What could you hear from Officer Motley's side of the conversation?

A. I did not listen to her conversation.

Q. Where were you in reference to where Officer Motley was at the time she was on the phone?

A. About the same distance as you and I. Probably three or four feet away.

Q. So you are saying that you can't tell me what she was saying because you weren't listening to her conversation?

A. Basically, yes.

Q. Yet, you were trying to talk to her at the time, right?

A. Right.

Q. Trying to find out what happened?

A. I would ask her a question, but she was busy talking on the telephone.

Q. What question did you ask her?

13

1  A. What happened.
2  Q. Okay. And did she give you any response?
3  A. From my recollection, something basically to the effect that she was assaulted by Ms. Fabrie and she
5  called First District unit.
6  Q. And she told you that. What happened next?
7  A. The First District units arrived.
8  Q. Do you remember how many officers arrived?
9  A. No. There's plenty of officers. It was -- the
10 call was put out as an officer in trouble, a 1033, they
11 call it.
12 Q. Besides yourself, Officer Motley, and Ms. Fabrie,
13 prior to the arrival of the First District officers, was
14 there any other officer or person in that immediate area
15 where you were?
16 A. No.
17 Q. My understanding is that Ms. Linda Fabrie's
18 husband was some place onsite; is that correct?
19 A. Yes.
20 Q. At that time when you came to the area where
21 Officer Motley and Ms. Fabrie were, did you see
22 Mr. Fabrie?

14

1  A. He was in the office with me when I got the phone
2  call. And, I mean, I didn't follow him. I don't know
3  if he followed me. But he did end up out in the front
4  lobby area. I don't know if he was in the station area
5  or the lobby area at that point.
6  Q. Okay. So when Officer Motley transferred a call
7  from Officer Cunningham to you, Mr. Fabrie was in your
8  office at that time?
9  A. Yes.
10 Q. And when you went to the front to find out what
11 was happening, at some point you saw him out there,
12 which meant he must have followed you out or came out
13 after you?
14 A. I can only assume, yes.
15 Q. Was Mr. Fabrie in proximity to overhear what was
16 going on after you came to the front and tried to find
17 out from his wife and Officer Motley what happened?
18 A. Could you repeat the question?
19 Q. Was Mr. Fabrie in close proximity to where you
20 were as you tried to find out from Ms. Fabrie and
21 Officer Motley what had occurred?
22 A. Yeah. I don't recall if he was in the station

15

1  area or whether he was over in the lobby area, which is
2  separated by the counter. But it could be in proximity
3  of the entire room. It is an open room with counter
4  space.
5  Q. What was Mr. Fabrie doing in your office at the
6  time that you received the call?
7  A. Just having a conversation with me.
8  Q. Was this about police business?
9  A. No.
10 Q. Personal?
11 A. I am assuming, yes.
12 Q. What do you mean you are assuming? You had the
13 conversation.
14 A. I mean, we talk about a lot of stuff. I will
15 just say it's personal, then.
16 Q. You say we talk about a lot of stuff. You are
17 friends with Mr. Fabrie?
18 A. Yes.
19 Q. My further understanding is during that time and
20 specifically on that day, Mr. Fabrie had used the
21 combination to unlock the door to get to the areas
22 beyond the public space?

16

1  A. Is that a question?
2  Q. Yes.
3  A. I don't know.
4  Q. Did it ever come to your attention that he had
5  the codes to access those doors?
6  A. Yes.
7  Q. When did you first learn about that?
8  A. That day.
9  Q. From whom?
10 A. I want to say it was Officer Cunningham. I think
11 that was part of the conversation he had with me on the
12 phone.
13 Q. Do you remember what your response to him about
14 that issue was?
15 A. I said I will take it under advisement.
16 Q. Besides Mr. Fabrie, were you aware of anyone
17 else -- civilian and not an employee of the MPD -- who
18 had the combination to those doors or locks?
19 A. There was some facilities people that had
20 combination codes to the locks.
21 Q. When you say facilities people, what are you
22 talking about?

### Page 17

1  A. Non-MPD civilians that come into the building to
2  fix the building.
3  Q. To fix the building. Other than those, anybody
4  else?
5  A. Not that I recall.
6  Q. So now, let's return to the arrival of the First
7  District officers. So what happened at that point?
8  A. They came in and I pointed them to my office
9  where Ms. Fabrie was. And some woman, I believe,
10 interviewed Officer Motley.
11 Q. Were you present when any of the First District
12 officers was interviewing Officer Motley?
13 A. I am sure I was. I mean, I was back and forth
14 between the station area and my office. I can only
15 assume I was.
16 Q. What was happening in your office?
17 A. They were interviewing Ms. Fabrie.
18 Q. Did you at any point hear or learn that Officer
19 Motley wanted Ms. Fabrie arrested for assault?
20 A. Yes.
21 Q. How did you learn that?
22 A. I want to say I heard her talking to one of the

### Page 18

1  officers about it.
2  Q. And so was there an arrest?
3  A. No.
4  Q. Was an arrest considered by anyone on the scene,
5  to your knowledge?
6  A. I can't speak for the other officers.
7  Q. Okay. How about you?
8  A. I was not arresting her.
9  Q. And your reason?
10 A. There was no probable cause.
11 Q. For?
12 A. For an assault.
13 Q. And you made that determination based on what
14 facts?
15 A. I had no information from Officer Motley. There
16 were no physical -- no physical evidence.
17 Q. What do you mean you had no information from
18 Officer Motley?
19 A. As I stated earlier, I asked her what happened.
20 All she told me was she was assaulted and that she
21 called First District officers to the scene. That was
22 the -- that was it for me as far as my interview with

### Page 19

1  Officer Motley.
2  Q. Okay. But after she got off the phone, there was
3  no effort to try to find out what is it you are talking
4  about how the assault happened, what is it she did, or
5  what you are claiming she did?
6  A. No. At that point, the First District officers
7  were on the scene. And I relinquished control of the
8  scene to Captain Harold.
9  Q. So who is Captain Harold?
10 A. Captain Harold -- Jeffrey Harold is my boss that
11 I called down to the scene.
12 Q. And when he arrived, the First District officers
13 were still on the scene?
14 A. Yes. And I believe there were some union people
15 who showed up, too.
16 Q. Do you remember which union people?
17 A. It should have been Wendell Cunningham, I
18 believe. And it might have been Michael Mollette, too.
19 I am pretty sure Wendell Cunningham was there. But at
20 that point, I wasn't talking to anybody. It was under
21 the control of Captain Harold at that point.
22 Q. But you said you didn't see a basis to arrest

### Page 20

1  Ms. Fabrie based on the information you had. And so did
2  you gather any information from anybody else on the
3  scene or overhear Officer Motley as she relayed the
4  specifics of what happened?
5  A. No. I relinquished the scene to Captain Harold.
6  Q. Okay. Why don't you tell me what that means.
7  A. He was the ranking officer on the scene. And he
8  was making the determination at that point.
9  Q. Did you have discussions with Captain Harold
10 about his decision and how he arrived at it?
11 A. No.
12 Q. Did you have any discussions with Captain Harold
13 about anything he learned on the scene?
14 A. Well, once he took control of the scene, he is
15 the one that did all the talking with the union people
16 that were there and with the First District officers
17 that were there, and Ms. Fabrie.
18 Q. Okay. And at some point after he did all of
19 that, did you then have a conversation with him?
20 A. Yes.
21 Q. Why don't you tell me about that conversation?
22 A. He told me that he was sending Ms. Fabrie home

## Page 21

1 and that he was turning the matter over to the Internal
2 Affairs Division to investigate.
3    Q. Did you at any point that evening tell Officer
4 Motley what was going to occur?
5    A. I don't recall if I ever talked to her again.
6    Q. Now, do you recall a Sergeant Sucato from 1-D who
7 had also come to Harbor Patrol in reference to that
8 incident?
9    A. I don't recall the name, but I believe there was
10 a sergeant there.
11    Q. Do you recall him telling you that he needed to
12 take Officer Motley to 1-D to get the warrant for
13 Ms. Fabrie?
14    A. I don't recall, no.
15         MR. JACKSON: Jeanett, what is the officer's
16 name?
17         MS. HENRY: Sucato, S-u-c-a-t-o.
18         BY MS. HENRY:
19    Q. Now, prior to 1-D officers coming on the scene,
20 did you talk to Ms. Fabrie about what had happened?
21    A. I don't believe I did. I didn't have a chance.
22 By the time I had gotten out to the station, I could

## Page 22

1 hear the sirens coming from the 1-D officers to the
2 scene so I don't recall. I might have stepped back in
3 there to check on her, but I don't think I had a chance
4 to really talk to her.
5    Q. At any point after that day, did you have an
6 opportunity to talk to Ms. Fabrie about what had
7 occurred?
8    A. Yes.
9    Q. How soon after?
10    A. Probably the next day.
11    Q. Could you tell me what you recall her telling
12 you?
13    A. She just recalled that -- she just stated to me
14 that she did not assault Officer Motley. And I think
15 she had broken her glasses. And I believe by that point
16 she had to go down and see the Internal Affairs agent.
17 I am trying to recall what day this fell on if it was a
18 Friday or middle of the week. But I am sure she had to
19 go down pretty soon after that. As a matter of fact,
20 the Internal Affairs agents were on the scene that
21 night, and they might have interviewed her then.
22    Q. Do you know that for a fact?

## Page 23

1    A. I think it was Sergeant Richard Brady from
2 Internal Affairs.
3    Q. Do you know if they interviewed her that night?
4    A. I know they talked to her. Whether it was an
5 interview, no.
6    Q. At the time you were having this conversation
7 with Ms. Fabrie, which you estimate might have been the
8 following day, had you heard that Officer Motley was
9 alleging that Ms. Fabrie threw a pen at her and threw
10 glasses at her -- Fabrie threw glasses and a pen at
11 Officer Motley? Did you hear that to be Officer
12 Motley's allegations of the assault?
13    A. From Officer Motley?
14    Q. From anybody?
15    A. Yes, that was an allegation that was brought out.
16 It had to have been from Officer Motley, I would assume,
17 if it was an accusation.
18    Q. And when did you hear that from Officer Motley?
19    A. I don't know if it was exactly from Officer
20 Motley. There was a lot of people involved in this, I
21 assume. It could have been Captain Harold that told me
22 this. It could have been Ms. Fabrie that told me this

## Page 24

1 or it could have been Officer Motley.
2    Q. Did Ms. Fabrie ever tell you why she was upset in
3 the first place?
4         MR. JACKSON: Objection. Who are you
5 referring to when you say "she"?
6         MS. HENRY: Why Ms. Fabrie herself was
7 upset.
8         THE WITNESS: My understanding from Ms.
9 Fabrie is that she was upset because she felt like she
10 was being retaliated against by Officer Motley because
11 she had recently had to go to an Internal Affairs
12 interview where she accused Officer Motley of selling
13 timeshares to her boat registration customers. She felt
14 like this was in retaliation to that.
15         BY MS. HENRY:
16    Q. Did Ms. Fabrie tell you how the incident started?
17    A. I believe it had something to do with Officer
18 Motley complaining to Wendell Cunningham about
19 Mr. Fabrie, her husband, having the combination to the
20 door.
21    Q. So that was upsetting to Ms. Fabrie?
22    A. Yes.

29

```
 1  or the union reps, were there any other Harbor Patrol
 2  officers onsite?
 3      A.  No.
        Q.  Let's turn now to Plaintiff's Exhibit 1. Now,
 5  could you tell me how this came about?
 6      A.  Yes. Ms. Fabrie came to a couple of my
 7  sergeants. I believe it was Sergeant Blevins -- Jeff
 8  Blevins and Sergeant Mitchell Armstrong. It may have
 9  even been Sergeant Dale Poskus. And she stated that she
10  had gone to a court hearing for a TPO that was placed
11  against her by Officer Motley at D.C. Superior Court.
12  And she stated that Officer Motley appeared for the
13  hearing in uniform. And she felt as though Officer
14  Motley had lied to the judge because of a previous TPO
15  that was placed against Officer Motley. Officer Motley
16  did not disclose that to the judge.
17      Q.  Now, your memorandum is dated April 7, 2010.
18  Approximately when in reference to this date did
19  Ms. Fabrie make those reports?
20      A.  Let me see what's on here. It must have been
21  probably the day of the court hearing or a little
22  afterwards.
```

30

```
 1      Q.  In your memorandum, you have identified the court
 2  hearing date of March 2, 2010?
 3      A.  Yes.
 4      Q.  So between Ms. Fabrie's report of these matters
 5  to the other sergeants and ultimately to you, so between
 6  that time and April 7, 2010 what, if anything, did you
 7  do to verify or corroborate what Ms. Fabrie had told you
 8  before writing this memo?
 9      A.  Once I received the information, I immediately
10  notified my captain, Captain Jeffrey Harold, who stated
11  that he would contact Internal Affairs to be guided on
12  how to investigate it. Over the time period of that
13  month, I can only assume nobody took action on it until
14  I asked again what the status was of the complaint. And
15  the captain conferred with Commander Christopher
16  Lojacono of the Internal Affairs Division, who stated,
17  Put it down in writing and forward it to the chain of
18  command.
        Q.  What was the name of that captain in Internal
20  Affairs?
21      A.  That was commander Christopher Lojacono.
22      Q.  How do you spell that last name?
```

31

```
 1      A.  L-o-j-a-c-o-n-o.
 2      Q.  And you say he was with IAD?
 3      A.  He is Internal Affairs.
 4      Q.  And he said you are to put the information in
 5  writing?
 6      A.  That's correct.
 7      Q.  So other than the conversation you and/or your
 8  sergeants had with Ms. Fabrie about the March 2, 2010,
 9  court hearing and the conversation with your Captain
10  Harold and IAD folks, did you talk with anybody else
11  over the course of this month about this incident or
12  what happened in court in efforts to verify what
13  Ms. Fabrie said?
14      A.  Just Ms. Fabrie when she was inquiring as to the
15  status of her complaint, but I don't recall talking to
16  anybody else about it.
17      Q.  Now, you were aware that Ms. Fabrie was
18  represented by an attorney in court on March 2, 2010,
19  correct?
20      A.  Yes.
21      Q.  Did you ever talk to her attorney about what
22  happened in court on March 2, 2010, prior to writing
```

32

```
 1  this April 7, 2010 memo?
 2      A.  No.
 3      Q.  Were you also aware that Officer Wendell
 4  Cunningham was also in court on March 2, 2010?
 5      A.  I heard that he was, yes, from Ms. Fabrie.
 6      Q.  Did you ever talk to him about what happened in
 7  court on that day prior to your preparing this April 7,
 8  2010, memo?
 9      A.  Not that I recall.
10      Q.  Did you also learn that Officer Michael Mollette
11  was also in court on March 2, 2010?
12      A.  Yes.
13      Q.  Did you ever talk to him prior to writing the
14  memo?
15      A.  Not that I recall, no.
16      Q.  Did you talk to Officer Motley prior to writing
17  the memo?
18      A.  Not on this subject, no.
19      Q.  Did you review any transcripts of the proceedings
20  on March 2, 2010, prior to writing your memo?
21      A.  No.
22      Q.  Now, in your memorandum in the last paragraph of
```

33

1 page one, you make a reference to attachment one. Do
2 you see that?
3   A. Yes.
    Q. And what is the attachment? Where did you get
5 that attachment one from, to begin with?
6   A. Sergeant Armstrong.
7   Q. Do you know where Sergeant Armstrong got that --
8 what you reference as attachment one?
9   A. He had a copy of it from a previous investigation
10 that he had done.
11  Q. And a previous investigation involving Officer
12 Motley?
13  A. Yes.
14  Q. Do you remember what that investigation involved,
15 what issue?
16  A. It involved a TPO that was placed against her.
17  Q. So that was the issue Sergeant Armstrong had
18 investigated?
19  A. That's my understanding, yes.
20  Q. And do you recall -- okay. It says here that the
21 TPO was issued on August 6, 2004?
22  A. Yes.

34

1   Q. Do you know that this was the TPO that was
2 discussed in court on March 2, 2010?
3   A. That's my understanding, yes.
4   Q. And your understanding came from Ms. Fabrie?
5   A. Yes.
6   Q. Did you show Ms. Fabrie that particular TPO to
7 confirm with her whether that was a TPO that was
8 discussed in court on March 2, 2010?
9   A. I don't believe so.
10  Q. How was it that Sergeant Armstrong came to give
11 you a copy of this TPO?
12  A. Because in the room when Ms. Fabrie was stating
13 the case that day and she said, no, there was a TPO
14 against Officer Motley, he was involved in the
15 conversation.
16  Q. Turning to page two of the exhibit in the first
17 sentence you begin, "Because of the criminal nature of
18 this incident." And what is the criminal nature you are
    referring to?
20  A. There was an allegation against a member that the
21 member had perjured themselves in front of a judge under
22 oath.

35

1   Q. And if a charge of perjury were sustained against
2 a member, what would be the penalty?
3   A. More than likely it would be termination.
4   Q. Is it your understanding that perjury has to
5 involve intentional lying?
6       MR. JACKSON: Objection. I object to the
7 extent that you are asking him to give a legal
8 definition of perjury. You can answer, if you know
9       THE WITNESS: Can you repeat the question?
10      BY MS. HENRY:
11  Q. Let me rephrase it a different way. When you
12 reference criminal nature of this incident, the criminal
13 incident you are referring to, as you described, is
14 perjury, correct?
15  A. Correct.
16  Q. And so what is your understanding of the elements
17 or the components or what is required for charging
18 perjury -- a criminal perjury?
19      MR. JACKSON: Same objection. You can
20 answer.
21      THE WITNESS: Intentional lying under oath.
22      BY MS. HENRY:

36

1   Q. At this point on April 7, 2010, did you know
2 whether Officer Motley had intentionally lied under
3 oath?
4   A. No.
5   Q. And so to whom did you submit this memorandum?
6   A. To my captain, as stated right on the memo.
7   Q. Which is where? Is it the first one --
8 commanding officer?
9   A. Commanding Officer Tactical Patrol Branch.
10  Q. It doesn't have a name. It is his title?
11  A. That's his signature there.
12  Q. I can't read it?
13  A. It said Jeffrey D. Harold.
14  Q. And then above Harold, who is that?
15  A. Commander James Crane. He is the commander of
16 Special Operations Division.
17  Q. And then from Crane it goes to the assistant
18 chief of police, Homeland Security Bureau. Who was that
19 at the time?
20  A. Assistant Chief Patrick Burke.
21  Q. And then from there to assistant chief of police,
22 Internal Affairs Bureau, which is -- who is that?

## Page 37

1  A. Assistant Chief Michael Anzalo.
2  Q. And so after your April 7, 2010, memo went up to
3  the chain of command, what happened next in reference to
   the allegations you raised in this?
5  A. I don't know.
6  Q. Were you ever contacted again about anything
7  regarding this memo?
8  A. The next time I was contacted, I might have been
9  interviewed by Internal Affairs for it similar to like
10 what you are asking on what my involvement was with it.
11 They did the same. And then the last thing I heard was
12 a notification to attend a Trial Board hearing.
13 Q. Was it your understanding that at some point
14 Officer Motley was served with notice of adverse action
15 with the threat of termination?
16 A. Yes.
17 Q. And so once she was served with the adverse
18 action papers, what happened to her status?
19 A. I was out of town when she got served, but I was
20 notified that she was revoked of her police powers. And
21 they detailed her, I want to say, to the Command
22 Information Center.

## Page 38

1  Q. So at the time she was served, she was physically
2  still reporting to the Harbor Patrol facility for work?
3  A. Correct.
4  Q. And why is it she was detailed?
5  A. You would have to ask Internal Affairs.
6  Q. You didn't have any role in that decision?
7  A. No.
8  Q. And you say she was detailed to -- I am sorry?
9  A. I think she was detailed to the Command
10 Information Center. She ultimately ended up at Property
11 Division, I believe.
12 Q. So did you learn the results of the Trial Board
13 process, hearing?
14 A. Only that she was not terminated.
15 Q. And so after that decision, was she returned to
16 the Harbor Patrol facility to do her work?
17 A. Not immediately. My understanding was that she
18 wanted to stay at -- I am assuming it was Property or
19 Evidence Control, wherever it was, I would say for maybe
20 two or three months until December. That's when the
21 Teletype was issued having her come back to Harbor.
22 Q. From whom did you learn that Officer Motley

## Page 39

1  wanted to stay at Property?
2  A. Commander Steven Sund.
3  Q. Steven Sund?
4  A. S-u-n-d.
5  Q. Stephen Sund. And he is commander of?
6  A. Special Operations Division.
7  Q. Did he tell you why Officer Motley said she
8  wanted to stay at Property?
9  A. He told me that he had a meeting with her, and
10 she stated to him that she preferred to stay at the
11 Property Division. He didn't give a clear reason why.
12 Q. And moments ago, you mentioned that there was a
13 telex?
14 A. A Teletype.
15 Q. Teletype in December?
16 A. Sometime in December there was a Teletype
17 returning -- ending her detail at Property Division.
18 Q. And this December, you are referring to December
19 2011?
20 A. Yes.
21 Q. So you said that Teletype ended her detail?
22 A. Correct.

## Page 40

1  Q. At the Property Division?
2  A. Correct.
3  Q. So what was her next move?
4  A. She was returned to the Harbor Patrol.
5  Q. So did she return there for work?
6  A. Yes.
7  Q. Is she still there?
8  A. No.
9  Q. What happened?
10 A. Ms. Fabrie submitted a complaint to myself and
11 Captain Robert Halbleib outlining her fears, hostile
12 work environment, basically her fear of Officer Motley,
13 and asked that there be a resolution to the problem with
14 her being there at the same time that Officer Motley was
15 there.
16     THE REPORTER: Can you spell that officer's
17 name?
18     THE WITNESS: Captain Robert Halbleib,
19 H-a-l-b-l-e-i-b.
20     BY MS. HENRY:
21 Q. What was that captain? What was his involvement
22 in what you just said?

41

1  A. Ms. Fabrie submitted a letter to myself and
2  Captain Halbleib.
3  Q. And who is he in the chain of command?
   A. He is my immediate supervisor.
5  Q. Is he involved with Captain Harold or what?
6  A. This is where it gets difficult. We have gone
7  through a number of captains, commanders, assistant
8  chiefs since this incident occurred back in 2010. So he
9  is my current captain. He replaced -- I don't even know
10 how to explain it. I will just say he replaced Captain
11 Harold.
12 Q. So Ms. Fabrie submitted this complaint, and you
13 are saying she said she was fearful of Officer Motley?
14 A. Correct.
15 Q. Did she say why she was fearful of Officer
16 Motley?
17 A. She outlined it in the memorandum.
18 Q. And what did she say?
19 A. From my recollection, Officer Motley carries a
20 gun and badge, she fears for her life. She feels as
21 though Officer Motley will continue to retaliate against
22 her. And she felt as though it was a hostile work

42

1  environment.
2  Q. So when did Ms. Fabrie submit this complaint?
3  A. I would say it was probably the day after Officer
4  Motley returned to Harbor.
5  Q. And would that be sometime in January of this
6  year or December of last year?
7  A. It was either December or January, yes.
8  Q. Okay.
9  A. It was within days of her being returned to
10 Harbor Patrol.
11 Q. Did Ms. Fabrie say whether Officer Motley did
12 anything to her between March 2, 2010, and September of
13 2010 when Officer Motley received the adverse action
14 notice and was detailed out?
15 A. No.
16 Q. And so what is the hostile work environment that
17 Ms. Fabrie complained about?
18 A. All the past interactions with Officer Motley
19 that -- this incident here as well as the incident at
20 the court. She thought it was a hostile work
21 environment.
22 Q. But the incident at the court is what was an

43

1  offshoot or result of the March 2, 2010, work place
2  incident, correct?
3  A. Correct.
4  Q. Other than the March 2, 2010, work place incident
5  and the court proceeding that followed from that, is
6  there something else that Ms. Fabrie has mentioned as to
7  why she is fearful of Officer Motley or why she believed
8  it is a hostile work environment for her if Officer
9  Motley is there?
10 A. You would have to ask her.
11 Q. I'm stating from the memo or the complaint?
12 A. From the memo. It's well enough that she wanted
13 to have her arrested.
14 Q. Who wanted her?
15 A. Officer Motley wanted to have Ms. Fabrie
16 arrested.
17 Q. Okay.
18 A. And she felt fearful. She felt it was in
19 retaliation. And she felt it will continue to be a
20 retaliatory-type situation.
21 Q. And so this complaint was in writing?
22 A. Yes.

44

1  Q. Do you remember how many pages?
2  A. One page.
3  Q. One page?
4     MS. HENRY: Counsel, may I request a copy of
5  that directly from you? I am asking Lieutenant Niepling
6  if he can provide a copy to counsel.
7     MR. JACKSON: He has already provided it.
8  Are we going to have an exhibit label?
9     MS. HENRY: Okay.
10    MR. JACKSON: I can get it now if you want
11 it for the purpose of this deposition.
12    MS. HENRY: Yes, could you. Let's take a
13 break.
14    (A recess was held.)
15    (Plaintiff's Exhibit No. 2, marked for
16 identification.)
17    BY MS. HENRY:
18 Q. I am showing you what has been marked as
19 Plaintiff's Exhibit 2. Before we took a break in the
20 deposition, you mentioned that you were talking about
21 the reasons Officer Motley had no longer been assigned
22 at Harbor Patrol, correct?

**Page 45**

1  A. We were talking?
2  Q. The reasons leading to her not being at Harbor
3  Patrol anymore.
   A. No. I was talking about the reason that
5  Ms. Fabrie felt fear at her job.
6  Q. Okay. All right. And so you say Ms. Fabrie
7  submitted a written complaint to you, correct?
8  A. That's correct.
9  Q. And the written complaint is what's here marked
10 as Exhibit 2, correct?
11 A. Yes.
12 Q. And so when Ms. Fabrie submitted this complaint
13 to you, did you sit and talk with her about the
14 allegations she set forth in this complaint?
15 A. No.
16 Q. Okay. What did you do with the complaint?
17 A. She had e-mailed it to myself and to Captain
18 Robert Halbleib. I advised Ms. Fabrie verbally that I
19 could not handle this, that it was beyond my pay grade
20 and beyond my authority. And I talked to Captain
21 Halbleib, advised him he should read this letter, and he
22 took it from there.

**Page 46**

1  Q. Okay. He took it from there to where? What
2  happened?
3  A. You would have to interview him on that.
4  Q. He never talked to you about it afterwards?
5  A. Well, the only thing he said was that he would
6  talk to his boss, which I am assuming would be Commander
7  Sund.
8  Q. Okay. So did your captain ever talk with you
9  about the contents of this complaint?
10 A. Generally, but no specifics. He said that he
11 would talk to his boss, which was Commander Sund. And
12 the next thing I know, there was a Teletype. I believe
13 there was a Teletype with her being detailed to the
14 Special Operations Division.
15 Q. Do you know when was the Teletype?
16 A. I can assume it was within that week that this
17 letter was submitted. I don't have the specific date.
18 Q. And where did you say Officer Motley was detailed
   to?
20 A. Actually, it was the Special Events Branch.
21 Q. The Special Events Branch?
22 A. Correct.

**Page 47**

1  Q. Is that under Special Operations Division or some
2  place else?
3  A. Yes.
4  Q. It is under SOD?
5  A. Yes.
6  Q. Do you know if she is still there?
7  A. No.
8  Q. You don't know or she is no longer there?
9  A. She is no longer there.
10 Q. Where is she now, to your knowledge?
11 A. There was a Teletype that detailed her to the
12 Fourth District.
13 Q. Do you recall when was that Teletype?
14 A. Maybe a couple weeks after she was detailed to
15 Special Operations Division.
16 Q. Can you tell me the name of your captain again?
17 I am sorry.
18 A. Sure. It is Captain Robert Halbleib,
19 H-a-l-b-l-e-i-b.
20 Q. In the third paragraph of Exhibit 2 -- I am
21 referring you to the third sentence that begins, Two
22 years ago. Do you see that sentence?

**Page 48**

1  A. The fifth line?
2  Q. Yeah, the fifth line that begins -- the sentence
3  that begins, Two years ago. Do you see that?
4  A. I see that.
5  Q. Do you know what "first charge of accusation
6  against me" Ms. Fabrie is referring to?
7  A. "Two years ago at the first charge of her
8  accusations against me." I am not sure I understand the
9  sentence. What's the question?
10 Q. I was just asking if you know what that's
11 referring to? What incident?
12 A. I can only assume that's referring to the
13 incident where her and Officer Motley were involved in
14 the altercation that we talked about previously.
15 Q. And that's February 2010?
16 A. I can only assume that. You would have to ask
17 Ms. Fabrie.
18 Q. Other than the incident of February 2010 and the
19 court proceeding that followed that, has Ms. Fabrie ever
20 told you that Officer Motley retaliated against her in
21 any way?
22 A. No.

## Page 49

1  Q. I want to direct your attention to the first
2  paragraph in Exhibit 2. And I want to refer you to the
3  fifth line that begins, "I do not dare enter the common
4  kitchen/break room." Do you see that?
5  A. Yes.
6  Q. Did Ms. Fabrie ever tell you that Officer Motley
7  threatened her, other than with the arrest in February
8  of 2010?
9  A. No.
10 Q. I refer you to the second paragraph of that
11 exhibit. And the third line, which is the end of that
12 sentence where it says she has become violent through
13 intimidation. Do you see that?
14 A. Yes.
15 Q. Did Ms. Fabrie ever tell you how she claims
16 Officer Motley became violent with her and intimidated
17 her?
18 A. No.
19 Q. Other than the February 2010 incident and the
20 court proceeding that followed from that, are you aware
21 of any other incident involving Ms. Fabrie and Officer
22 Motley? And I am going to say other than one other

## Page 50

1  thing, the complaint that Ms. Fabrie made about Officer
2  Motley that led to the selling timeshares. Other than
3  those two incidents, are you aware of any other?
4  A. Not that rose to my level of having to be
5  involved. I am sure there has been chatter, personality
6  conflicts, things of that nature, but nothing specific.
7  Q. Now, I want to move to another incident where
8  Officer Motley received a proposed adverse action. And
9  the incident involved her leaving a key in her boat. Do
10 you remember that incident?
11 A. Yes.
12 Q. And my information is that that incident occurred
13 around May 22 of 2010. Does that time period -- I am
14 not committing you to that specific date. But does that
15 time period sound right?
16 A. It sounds about right, yes.
17 Q. Now, how did this become a proposed adverse
18 action -- this incident against Officer Motley?
19 A. I got a call or an e-mail, one of the two -- I am
20 not sure which -- from Commander Hilton Burton. And I
21 believe it was an e-mail. The watch commander for the
22 Second District had forwarded a watch commander report

## Page 51

1  to the commander in reference to Officer Motley involved
2  in some type of arrest situation at the Georgetown pier
3  wherein somebody attempted to steal her boat that was
4  tied to the dock. And it was either left with the keys
5  in it or left with the keys in it with the boat engines
6  running. And the watch commander forwarded that to the
7  commander of SOD, who then forwarded it me, to say what
8  is this all about.
9  Q. And so when you received that e-mail what, if
10 anything, did you do?
11 A. I referred right back to the commander stating
12 that Internal Affairs didn't want me investigating
13 Officer Motley, because every time I investigated her,
14 she accuses me of being unfair and not impartial. And
15 so he, therefore, gave it to another lieutenant to
16 investigate. And I want to say it was Lieutenant Dan
17 Crawford.
18 Q. And do you understand that the investigation
19 centered specifically around her leaving the key in the
20 boat?
21 A. That's my understanding.
22 Q. Now, since you have been at the Harbor Patrol

## Page 52

1  Unit since 2005, other than Officer Motley, are you
2  aware of anybody else who has left keys in the boat?
3  A. No.
4  Q. Are you aware of anybody else, other than Officer
5  Motley, who was the subject of proposed adverse action,
6  in reference to leaving a key in the boat?
7  A. Can you ask the question again? The subject?
8  Q. Adverse action leaving a key in the boat?
9  A. No.
10 Q. Now, did you say it was Lieutenant Crawford that
11 you understood did the investigation?
12 A. From my recollection, I believe it was.
13 Q. Do you understand that after conducting the
14 investigation, Lieutenant Crawford recommended that
15 given what he had learned from speaking to officers and
16 learning that people leave keys in boats that he was
17 recommending a change in the policy?
18 A. No.
19     MR. JACKSON: Objection.
20     BY MS. HENRY:
21 Q. Did you ever talk with Lieutenant Crawford about
22 this particular investigation of Officer Motley?