**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **KIMBERLI MOTLEY-IVEY**, <br><br> Plaintiff, <br><br> v. <br><br> **DISTRICT OF COLUMBIA**, *et al.*, <br><br> Defendants. | Civil Action No. 09-cv-571 (RLW) |

<u>**MEMORANDUM OPINION**</u>

Plaintiff Kimberli Motley-Ivey ("Motley") is an officer with the District of Columbia Metropolitan Police Department.  Through this action, she asserts a number of employment-based claims largely stemming from the time she was assigned to the Police Department's Harbor Patrol Division.  Motley brings suit against the District of Columbia (the "District") and three of her superior officers in their individual capacities, Assistant Chief Alfred Durham ("Asst. Chief Durham"), Lieutenant Paul Niepling ("Lt. Niepling"), and Sergeant Dale Poskus ("Sgt. Poskus") (collectively, the "Officer Defendants").  In her Fourth Amended Complaint, Motley asserts the following causes of action: Hostile Work Environment under Title VII of the Civil Rights Act of 1964 ("Title VII") and the D.C. Human Rights Act ("DCHRA") (Counts I and III); Retaliation under Title VII and the DCHRA (Counts II and IV); Gender Discrimination under Title VII and the DCHRA (Counts VI and VII); Intentional Infliction of Emotional Distress (Count V); and claims under 42 U.S.C. § 1983 (Count VIII).[1]  This matter is presently before the Court on Defendants' Motion for Summary Judgment (Dkt. No. 42).

---

[1]     Counts III, IV, VII, and VIII are asserted against all defendants; Count V is brought against the Officer Defendants only; and Counts I, II, and VI are pled solely against the District.

Upon careful consideration of the parties' briefing, the entire record in this action, and the arguments of counsel during hearings on February 4 and 7, 2013, the Court concludes, for the reasons set forth herein, that Defendants' Motion will be **GRANTED IN PART** and **DENIED IN PART**.  For purposes of this ruling, the Court will assume that the reader is familiar with the factual assertions and arguments made by the parties and will not recite those again here.

## ANALYSIS

### A.  Standard of Review

Summary judgment is appropriate when the moving party demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009).  To establish a genuine issue of material fact, the nonmoving party must demonstrate—through affidavits or other competent evidence, FED. R. CIV. P. 56(c)(1)—that the quantum of evidence "is such that a reasonable jury could return a verdict for the nonmoving party."  *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson*, 477 U.S. at 248).  While the Court views all facts in the light most favorable to the nonmoving party in reaching that determination, *Keyes v. District of Columbia*, 372 F.3d 434, 436 (D.C. Cir. 2004), the nonmoving party must nevertheless provide more than "a scintilla of evidence" in support of its position, *Anderson*, 477 U.S. at 252.  But "[i]f material facts are at issue, or, though undisputed, are susceptible to divergent inferences, summary judgment is not available."  *Kuo-Yun Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994).

**B. Motley's Claims Under the DCHRA and Title VII for Hostile Work Environment, Retaliation, and Gender Discrimination (Counts I, II, III, IV, VI and VII).**

Before turning to the merits of Motley's claims under the DCHRA and Title VII, the Court first deals with a number of timeliness challenges mounted by Defendants as to both categories of claims. First, Defendants attack Motley's DCHRA claims as untimely on several grounds, arguing that: (1) to the extent Motley's claims against the District are based on acts occurring prior to September 14, 2010, those claims are barred by D.C. Code § 12-309; (2) to the extent Motley's DCHRA claims against any defendant are based on acts occurring prior to March 26, 2008, those claims are time-barred by the DCHRA's one-year statute of limitations; and (3) the DCHRA's "election of remedies" doctrine precludes Motley from relying on any acts occurring prior to August 7, 2006. In addition, with respect to some aspects of Motley's claims against the District under Title VII, Defendants argue that she failed to properly exhaust her administrative remedies with the Equal Employment Opportunity Commission ("EEOC"). The Court addresses these arguments in turn.

**1.  Exhaustion Under D.C. Code § 12-309**

It is well settled that a plaintiff cannot maintain an action against the District of Columbia for unliquidated damages "unless, within six months after the injury or damage was sustained, the claimant . . . has given notice to the Mayor of the District of Columbia of the approximate time, place, cause, and circumstances of the injury or damages." D.C. CODE § 12-309. "[W]ritten notice under § 12-309 is a condition precedent to filing suit against the District," *Tucci v. District of Columbia*, 956 A.2d 684, 695 (D.C. 2008), and the D.C. Court of Appeals has expressly held that § 12-309's notice requirements apply to claims for unliquidated damages

3

under the DCHRA brought against the District, *Owens v. District of Columbia*, 993 A.2d 1085, 1089 (D.C. 2010).

In this case, Motley sent a § 12-309 letter to Mayor Vincent Gray on March 14, 2011, advising of her intention to assert claims against the District of Columbia.  (Dkt. No. 42-17). Defendants do not dispute this fact, but they argue that, given the timing of Motley's letter, § 12-309 bars her from pursuing DCHRA claims against the District that are premised on acts occurring prior to September 14, 2010—*i.e.*, more than six months prior to her letter.  Motley contends otherwise, citing to the U.S. Supreme Court's decision in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002), and arguing that the "continuing violation" doctrine permits her to rely upon allegations reaching as far back as 1994, when she was first assigned to Harbor Division.  However, the Court finds Motley's reliance on *Morgan* misplaced, at least with respect to the issue of her compliance with § 12-309.

In this respect, neither side provided the Court with any authority squarely addressing whether the continuing violation doctrine applies to exhaustion under D.C. Code § 12-309, and based on the Court's own research, it appears that neither the D.C. Court of Appeals nor our Circuit has spoken to the issue.  But in this Court's view, the continuing violations doctrine—a principle impacting statute of limitations issues, *see, e.g.*, *Keohane v. United States*, 699 F.3d 325, 329 (D.C. Cir. 2012) ("Under the continuing violation doctrine, the statute of limitations begins to run only after the date of the last injury.")—finds no application in the context of exhaustion under § 12-309.  The D.C. Court of Appeals has repeatedly explained that § 12-309 "is not, and does not function as, a statute of limitations."  *E.g.*, *Brown v. District of Columbia*, 853 A.2d 733, 736-37 (D.C. 2004).  Rather, "Section 12-309 was purely a notice provision specifically designed to avoid, as applied to the District, the pitfalls of the statute of limitations."

4

*Gwinn v. District of Columbia*, 434 A.2d 1376, 1378 (D.C. 1981).   It instead operates as a "departure from the common law concept of sovereign immunity" and a "condition precedent" to filing suit against the District that must "be strictly construed."   *Id.*; *see also Barnhardt v. District of Columbia*, 8 A.3d 1206, 1214 (D.C. 2010) (characterizing § 12-309 as a "condition of a waiver of sovereign immunity by the District of Columbia").   Moreover, under § 12-309, "the six-month clock begins to run from the moment the plaintiff sustains the injury, not from the moment a cause of action accrues."   *Owens*, 993 A.2d at 1090 (quoting *District of Columbia v. Dunmore*, 662 A.2d 1356, 1359 (D.C. 1995)).

Therefore, under D.C. Code § 12-309, Motley can only pursue her DCHRA claims against the District to the extent they are premised on acts occurring within the six-month period preceding her letter to the Mayor—*i.e.*, from September 14, 2010 through March 14, 2011.

### 2.   The DCHRA's One-Year Statute of Limitations

Defendants next argue that some of Motley's DCHRA claims against both the District and the Officer Defendants are partially time-barred by the one-year statute of limitations set forth in D.C. Code § 2-1403.16(a).   More specifically, they argue that her discrimination and retaliation claims under the DCHRA are untimely to the extent they are premised on discrete acts occurring prior to March 26, 2008—more than one year before Motley filed suit on March 26, 2009.   In her opposition, Motley does not dispute that her DCHRA claims are subject to the one-year limitations period under D.C. Code § 2-1403.16(a).   Instead, she again cites to the Supreme Court's decision in *Morgan*, and argues that her claims are covered by the continuing violations theory.   But in *Morgan*, the Supreme Court actually held that the continuing violation doctrine does <u>not</u> apply to claims of discrete discriminatory or retaliatory acts under Title VII.   *Morgan*, 536 U.S. at 113.   The D.C. Court of Appeals has expressly extended this analysis to claims of

discrete discriminatory or retaliatory acts under the DCHRA.  *Cesarano v. Reed Smith, LLP*, 990 A.2d 455, 463-65 (D.C. 2010) ("[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges."); *see also Barrett v. Covington & Burling LLP*, 979 A.2d 1239, 1248-49 (D.C. 2009).  Thus, Motley's reliance on the continuing violation doctrine, at least in connection with her gender discrimination and retaliation claims, is unavailing.  Under *Morgan* and its progeny, she can only proceed with her gender discrimination and retaliation claims under the DCHRA to the extent they are premised on acts occurring on or after March 26, 2008, and to the extent that those discrete acts were properly exhausted at the administrative level.

Motley's hostile work environment claims under the DCHRA, on the other hand, present a different scenario, but the Court does not understand Defendants to be arguing that her hostile work environment claims are limited to acts occurring on or after March 26, 2008, and in fact, Defendants expressly confirm as much in the reply brief.  (Dkt. No. 45 ("Defs.' Reply") at 4-5).  But to remove all doubt, the Court agrees that *Morgan* upheld the applicability of the continuing violation doctrine to hostile work environment claims under Title VII, *Morgan*, 536 U.S. at 121, and that analysis has been expressly extended to hostile work environment claims under the DCHRA, *see Lively v. Flexible Packaging Ass'n*, 830 A.2d 874, 890 (D.C. 2003).  Put another way, "if an act contributing to the [hostile work environment] claim occurs within the filing period, the entire time period of the hostile environment may be considered by the court for the purposes of determining liability."  *Id.*  In this case (and as explained *infra*), Motley's hostile work environment claims are essentially premised on Defendants' issuance of allegedly unjustified and disproportionate disciplinary actions against her, as compared to her male colleagues.  Because at least some of the disciplinary actions that comprise Motley's hostile

work environment claim fall within the applicable statutory period, she may properly rely on other instances of allegedly discriminatory discipline that fall outside that time period in pursuing her hostile work environment claims under the DCHRA.

### 3. The Election of Remedies Doctrine

As a final attack on the timeliness of Motley's DCHRA claims, Defendants argue that Motley cannot proceed with any DCHRA claim that occurred prior to August 7, 2006, because she elected to proceed with those claims before the D.C. Office of Human Rights ("OHR"), which investigated and issued a determination on these claims.   In this regard, Defendants are correct that the DCHRA generally "requires complainants to choose between an administrative or a judicial forum in which to pursue their claims," such that "where one opts to file with the [D.C. Office of Human Rights], he or she generally may not also file a complaint in court" raising the same claims.   *Carter v. District of Columbia*, 980 A.2d 1217, 1223 (D.C. 2009). Here, Motley does not dispute that the claims raised in her September 2004 charge of discrimination were filed with OHR and were investigated by OHR.   She also does not dispute that, on August 7, 2006, OHR issued a probable cause determination letter as to those claims. (Dkt. No. 49-1 ("Compiled Facts"), Pl.'s Facts at ¶ 17).[2]  Despite this, Motley argues that she

---

[2]      Where practical, the Court cites to the parties' "Compiled Statement of Material Undisputed Facts, Responses, and Replies" when referencing evidence in the case. (*See* Dkt. No. 49-1).  However, given the overwhelming failure of both sides to comply with the Court's Order in preparing this statement—as discussed with counsel at length during the hearings on this Motion—in many cases, the parties' statement proved woefully unhelpful to the Court, and the Court finds it necessary to cite directly to evidence in the record in some instances.  The Court reiterates that, as both sides were expressly cautioned and admonished during recent hearings, any future noncompliance with the directives of this Court—or with the Federal Rules of Civil Procedure or the Court's Local Rules more generally—will not be tolerated.

can still proceed with those claims because, as she sees it, OHR never rendered a "finding on the merits."  (Dkt. No. 44 ("Pl.'s Opp'n") at ECF p. 22).

There are two statutory exceptions to the election of remedies doctrine under the DCHRA: (1) if "OHR dismissed the complaint for 'administrative convenience,'" or (2) if "the complainant withdraws her OHR complaint before OHR has decided it."  *Carter*, 980 A.2d at 1223.  Motley does not argue that she withdrew her complaint with OHR.  Instead, she contends that, after OHR rendered its probable cause determination, it referred any further action to the EEOC pursuant to a worksharing agreement.  In essence, Motley appears to argue that OHR's deferral to the EEOC amounted to a dismissal for "administrative convenience."  To be sure, Motley's briefing on this issue leaves a great deal to be desired.  But during oral argument, Motley's counsel rightly pointed out that her initial charge was cross-filed with both OHR and the EEOC.  (*See* Dkt. No. 42-19).  In addition, following oral argument, Motley belatedly filed with the Court a copy of the right-to-sue notice issued by the EEOC for Charge No. 10C200400347, which advised Motley that she "ha[d] the right to institute a civil action" on the claims set forth in her charge.   (Dkt. No. 50-1).[3]  It is true that "when the OHR invokes the automatic termination provision of the worksharing agreement for complaints filed originally with the EEOC, that ruling constitutes a dismissal on the ground of administrative convenience under the statute."  *Griffin v. Acacia Life Ins. Co.*, 925 A.2d 564, 574 (D.C. 2007); *see also Ibrahim v. Unisys Corp.*, 582 F. Supp. 2d 41, 46-47 (D.D.C. 2008).  And while Motley did not present any documentation confirming that OHR formally referred Motley's charge to the EEOC for resolution, Defendants do not dispute her assertions in this respect, and the subsequent right-to-sue notice she received from the EEOC lends considerable support to her argument.

---

[3]     The Court notes that Defendants have not objected to the belatedness of Motley's submission.

Accordingly, at this stage and on the present record, the Court concludes that Motley has at least raised a triable issue of fact as to whether her original charge was dismissed by OHR for "administrative convenience," and declines to hold that the election of remedies doctrine bars certain aspects of her DCHRA claims.[4]

### 4. <u>Exhaustion of Remedies as to Title VII Claims</u>

Under Title VII, plaintiffs "must timely exhaust their administrative remedies before bringing their claims to court," *Payne v. Salazar*, 619 F.3d 56, 65 (D.C. Cir. 2010) (internal quotations omitted), and "a timely administrative charge is a prerequisite to initiation of a Title VII action in the District Court," *Jarrell v. U.S. Postal Serv.*, 753 F.2d 1088, 1091 (D.C. Cir. 1985). A charge with the EEOC "shall be filed within 180 days after the alleged unlawful employment practice occurred," although that window is extended to 300 days when the plaintiff "initially institutes proceedings with a State or local agency," such as the D.C. Office of Human Rights. 42 U.S.C. § 2000e-5(e)(1). In the instant case, there is no dispute that the 300-day window governs the exhaustion of Motley's claims.

---

[4]     The evidence the parties presented to the Court surrounding this issue was scant—the Court did not have the benefit of reviewing OHR's docket or case file for the particular charge, nor did Motley present any documentary evidence confirming that OHR decided not to pursue any further action on that charge. But the Court's reading of the OHR's probable cause determination indicates that, if the District declined to pursue conciliation efforts at that stage, the matter would proceed to a summary determination or a hearing on the merits within OHR. (Dkt. No. 42-18). Neither side presented any evidence suggesting that either of those outcomes transpired. Instead, Motley argues—and Defendants do not meaningfully contest—that OHR refrained from any further action on Motley's claims and referred the resolution of her charge to the EEOC, which issued a right-to-sue notice on December 30, 2008. As such, and based on the present record, the Court declines to hold that the election of remedies doctrine bars some portion of Motley's claims. However, to the extent that Defendants obtain <u>additional evidence or information</u> suggesting that OHR <u>did not</u> dismiss Motley's charge for "administrative convenience"—*e.g.*, based on the docket sheet or case file from OHR with respect to that particular charge—Defendants may renew this argument through an appropriate motion *in limine*, and the Court will take another look at this particular issue, if warranted.

From there, Defendants first argue that, based on the content of Motley's initial discrimination charge filed on September 20, 2004, she did not properly exhaust any claims that arose prior to November 2003.  The Court agrees.  Motley herself limited the scope of her claims in the narrative portion of that discrimination charge, asserting that her co-workers and supervisors had subjected her to a hostile work environment "[f]rom November 2003 to the present."  (Dkt. No. 42-19).  While Motley now contends, in conclusory fashion, that her charge addressed a "continuing pattern of harassment dating back to September 2001," her own written summary in the charge itself belies that assertion.  Accordingly, the Court finds that Motley failed to properly exhaust any Title VII claims occurring prior to November 2003.

After her initial charge, Motley subsequently filed three additional charges with the EEOC, on March 16, 2007, October 27, 2009, and March 21, 2011.  (Dkt. Nos. 42-20, 42-21, & 42-22).  With respect to those charges, Defendants cite to *Morgan* and argue that Motley's claims in this case must necessarily be limited to the "discrete acts" identified in each charge. Defendants are partly correct.  As to Motley's gender discrimination and retaliation claims under Title VII, *Morgan* and its progeny required her to exhaust her administrative remedies with respect to each "discrete act."  *Morgan*, 536 U.S. at 122; *Baird v. Gotbaum*, 662 F.3d 1246, 1251 (D.C. Cir. 2012).  Motley can therefore only base those claims on the discrete acts expressly set forth and exhausted in her various EEOC charges.

However, as the Court already explained, a different analysis applies to Motley's claims for hostile work environment.  As the D.C. Circuit recently explained, "[b]oth incidents barred by the statute of limitations and ones not barred can qualify as part of the same actionable hostile environment claim . . . if they are adequately linked into a coherent hostile environment claim— if, for example, they involve the same type of employment actions, occur relatively frequently,

and are perpetrated by the same managers." *Baird*, 662 F.3d at 1251 (quoting *Morgan*, 536 U.S. at 120-21). According to Motley, her hostile work environment claims are premised on Defendants' use of "unjustified disciplinary actions," which she contends were imposed in a discriminatory manner on account of her gender. Insofar as her EEOC charges encompass these allegations to some extent, and expressly set forth at least a few examples of this allegedly disproportionate discipline, Motley may be able to properly rely on similar allegations of disproportionate discipline in pursuing her hostile work environment claims, even if not explicitly exhausted through her EEOC charges.

With those issues resolved, the Court now turns to the merits of Motley's claims under both the DCHRA and Title VII.

### 5.  Motley's Hostile Work Environment Claims

Under Title VII, an employer cannot create or condone "a hostile or abusive work environment if the harassment is sufficiently abusive to affect a term, condition, or privilege of employment." *Davis v. Coastal Int'l Sec., Inc.*, 275 F.3d 1119, 1122 (D.C. Cir. 2002). To prevail on a hostile work environment claim, a plaintiff must show that her employer subjected her to "discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67 (1986)); *see also Barbour v. Browner*, 181 F.3d 1342, 1347-48 (D.C. Cir. 1999). Moreover, "hostile behavior . . . cannot support a claim of hostile work environment unless there exists some linkage between the hostile behavior and the plaintiff's membership in a protected class." *Na'im v. Clinton*, 626 F. Supp. 2d 63, 73 (D.D.C. 2009). To determine whether a hostile work environment exists, the court looks to the totality of the circumstances, including

the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998). Because "the legal standard for establishing discrimination under the DCHRA is substantively the same as under Title VII," the Court considers Motley's hostile work environment claims under Title VII and the DCHRA coextensively. *Elhusseini v. Compass Group USA, Inc.*, 578 F. Supp. 2d 6, 18 (D.D.C. 2008) (citing *Sparrow v. United Air Lines Inc.*, 216 F.3d 1111, 1114 (D.C. Cir. 2000)).

In seeking summary judgment on Motley's hostile work environment claims, Defendants focus their arguments on Motley's allegations of diffuse interactions with her male coworkers and a series of purportedly inappropriate comments and remarks. In turn, Defendants argue that those allegations fall short of the "severe or pervasive" showing necessary to maintain a viable hostile work environment claim. (Dkt. No. 42 ("Defs.' Mem.") at 27-30). But based on Motley's opposition briefing, it seems that Defendants misunderstand the basis for her claims. According to Motley, her hostile work environment claims are premised on Defendants' practice of imposing "unjustified disciplinary action" against her that was "continuous, concerted and pervasive," and that was allegedly disproportionate to the discipline imposed on her male colleagues. (Pl.'s Opp'n at ECF p. 25). The Court need not identify each and every incident raised by Motley to resolve this motion, but some of the incidents Motley identifies include:

- Being investigated for an incident when she had difficulty docking a boat in February 2008, and apparently being recommended for adverse disciplinary action, while the two male officers involved in the incident received only "official reprimands" (Compiled Facts, Pl.'s Facts at ¶¶ 27-28);[5]

---

[5]     The Court notes that Motley not only alleges that she was disciplined more frequently than her male colleagues, but she also contends that the discipline she received (typically in the form of "adverse actions") was more severe than that imposed on male officers (typically in the form of "corrective actions"). According to Motley's statement of facts, "corrective actions"— which include "PD 750s," "dereliction reports," "official reprimands," and "letters of

- Being cited for adverse action for willfully disobeying an order to clear out her lockers in April 2008, despite seeking further guidance from her male commanding officers concerning their directive (*Id.*, Pl.'s Facts at ¶¶ 32-35);

- Being cited for adverse action for "conduct unbecoming" and suspended for 3 days without pay in May 2008, after she questioned Sgt. Poskus about coming in late to work (*Id.*, Pl.'s Facts at ¶¶ 36-39); and

- Being cited for adverse action for negligence and suspended for 2 days without pay in July 2010, for leaving the keys in a boat docked at the Georgetown Harbor, despite the fact that the investigation revealed that leaving the keys in a boat was common practice within the Harbor Division (*Id.*, Pl.'s Facts at ¶¶ 61-66).

Notably, a pattern of allegedly undeserved, excessive, and/or disproportionate discipline can form the basis for a viable hostile work environment claim, at least where the plaintiff provides credible evidence that the alleged justification underlying that pattern of discipline is unlawful discrimination. *See, e.g.*, *Che v. Mass. Bay Transp. Auth.*, 342 F.3d 31, 40-41 (1st Cir. 2003) (finding sufficient evidence to support jury's finding of hostile work environment where, among other allegations, the plaintiff "received undeserved or excessive discipline on multiple occasions over a roughly two year period"); *Wise v. Ferreiro*, 842 F. Supp. 2d 120, 126-27 (D.D.C. 2012) (denying motion to dismiss hostile work environment claim where, among other allegations, plaintiff alleged that he was subjected to "threats of discipline based on false accusations").[6]

---

prejudice"—apparently do not trigger any immediate employment consequences, but simply remain in an officer's personnel file for 2 years; by contrast, "adverse actions" are more severe and can lead to suspension, fines, reductions of pay, reductions in rank, and/or termination. (Compiled Facts, Pl.'s Facts at ¶ 21-24). Defendants do not credibly dispute her characterization of the difference between the two overall categories of discipline. In addition, the evidence cited by Motley in support of these contentions is testimony from one of Defendants' own witnesses, Sgt. Poskus. (*See* Dkt. No. 42-5 at ECF p. 15-16).

[6]     The Court is mindful that, in some instances, particular disciplinary actions taken against Motley might also constitute actionable adverse actions for purposes of her discrimination and retaliation claims under Title VII or the DCHRA, where, for instance, Motley was suspended without pay, or suffered some other type of tangible employment consequences. However, as the D.C. Circuit recently made clear, this does not preclude Motley from relying on those same

In reply, Defendants do not offer any credible argument as to how the scope of discipline Motley describes falls short of the "severe or pervasive" threshold necessary to sustain her hostile work environment claim.  Instead, they simply argue that Asst. Chief Durham was not involved in any of those disciplinary actions, and that Motley does not dispute that she was involved in the activity she was accused of.  (Defs.' Reply at 8).  But those arguments largely miss the mark.  In short, Motley has raised a genuine issue of fact as to whether the discipline imposed against her, when considered as a whole, was sufficiently "severe or pervasive," and she has adduced sufficient evidence from which a reasonable jury might conclude that those disciplinary actions were motivated by her gender, given the comparative discipline (or lack thereof) levied against her male colleagues.

Accordingly, the Court will deny summary judgment as to Motley's hostile work environment claims against the District of Columbia, under both the DCHRA and Title VII (Counts I and III).   In addition, given Lt. Niepling's and Sgt. Poskus' apparent involvement in Motley's disciplinary actions—whether through initiating investigations, issuing adverse actions, and/or reviewing and recommending particular disciplinary actions—the Court will permit Motley's hostile work environment claims under the DCHRA (Count III) against Lt. Niepling and Sgt. Poskus to proceed to trial.

---

incidents—where considered with other disciplinary actions, as a whole—to support her hostile work environment claims:

> [W]e find no authority for the idea that particular acts cannot as a matter of law simultaneously support different types of Title VII claims, and of course, plaintiffs are free to plead alternative theories of harm that might stem from the same allegedly harmful conduct. Thus, although a plaintiff may not combine discrete acts to form a hostile work environment claim without meeting the required hostile work environment standard, neither can a court dismiss a hostile work environment claim merely because it contains discrete acts that the plaintiff claims (correctly or incorrectly) are actionable on their own.

*Baird*, 662 F.3d at 1252; *see also Peters v. District of Columbia*, 873 F. Supp. 2d 158, 195 (D.D.C. 2012); *Herbert v. Architect of the Capitol*, 839 F. Supp. 2d 284, 300 (D.D.C. 2012).

Motley's DCHRA hostile work environment claims against Asst. Chief Durham, however, are a different matter. Motley does not present any evidence to establish that Asst. Chief Durham was involved in any of the disciplinary actions that form the basis for her hostile work environment claims. Indeed, it is undisputed that he was only assigned to Harbor Patrol from 2000 through 2005, years before the instances of discipline that Motley highlights through her opposition brief. (Compiled Facts, Defs.' Facts at ¶ 1). At best, the only allegation that implicates Asst. Chief Durham is Motley's speculative assertion that, when he first arrived at Harbor in 2000, she believed that he wanted her to "befriend him in a way that, probably in a sexual way, that [she] would be taken care of there." (Pl.'s Opp'n at ECF p. 25). This type of singular, discrete incident—even if Motley's speculative testimony were credited—falls far short of the requisite "severe or pervasive" benchmark necessary to pursue a hostile work environment claim.[7] Thus, Motley's DCHRA hostile work environment claim against Asst. Chief Durham (through Count III) will be dismissed.

### 6. **Motley's Gender Discrimination and Retaliation Claims**

Under both Title VII and the DCHRA, claims of gender discrimination and retaliation are evaluated pursuant to the familiar, three-part burden-shifting test articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). First, the plaintiff must establish a *prima facie* case. For her discrimination claims, Motley must establish that: "(1) she is a member of a

---

[7]    During oral argument, Motley's counsel also claimed that Asst. Chief Durham created or contributed to a hostile work environment by allegedly initiating an investigation into Motley's overtime pay while on sick leave, in February 2010. Upon review of the evidence that Motley cites in support of this assertion, however, it appears that Asst. Chief Durham's involvement in that investigation—which ultimately did not result in any adverse consequences to Motley—was substantially more limited than Motley suggests. (*See* Dkt. No. 42-13 at ECF p. 21). But even viewing that evidence in the light most favorable to Motley, this singular incident is neither "severe" nor "pervasive," and cannot form the basis for a hostile work environment claim.

protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007).  As to her retaliation claims, Motley's *prima facie* case consists of demonstrating: "(1) that [s]he engaged in statutorily protected activity; (2) that [s]he suffered a materially adverse action by [her] employer; and (3) that a causal link connects the two." *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009).  Thereafter, the burden shifts to Defendants to articulate a "legitimate, nondiscriminatory reason" for the challenged employment action(s).  *McDonnell Douglas*, 411 U.S. at 802-04; *Wiley*, 511 F.3d at 155.  Finally, Motley "must be afforded the opportunity to prove" that Defendants' proffered motive "was not its true reason, but was a pretext for discrimination." *Barnette v. Chertoff*, 453 F.3d 513, 516 (D.C. Cir. 2006).

In seeking summary judgment, Defendants principally attack Motley's ability to establish a *prima facie* case as to both categories of claims, arguing that many of the issues Motley complains about do not constitute actionable adverse actions, including: (1) Motley's co-workers' alleged use of abusive language; (2) the "notice of termination" Motley received in September 2010, given that it was only a "recommendation" and that she was never actually terminated; (3) Motley's alleged lack of training opportunities; and (4) Motley's receipt of poor performance evaluations.  (Defs.' Mem. at 31-34).  In large part, Motley does not contest these arguments, but her opposition briefing does identify a list of allegedly adverse actions that she challenges through her discrimination and retaliation claims.  (Pl.'s Opp'n at ECF pp. 27-28). However, not all of those actions were properly exhausted during the administrative process with the EEOC, consistent with the Court's earlier analysis.  Rather, the only discrete claims that were both specifically exhausted and identified in Motley's opposition are:

- the July 2010 "neglect of duty" charge for leaving the keys in a boat, pursuant to which Motley was suspended for 2 days without pay; and

- the September 2010 charges and "notice of termination," pursuant to which Motley was stripped of her police powers, suspended without pay for 10 days, and transferred to the Property Division and assigned administrative work.

(Pl.'s Opp'n at ECF pp. 27-28).  Thus, the Court considers only these incidents in evaluating Motley's gender discrimination and retaliation claims.[8]

The D.C. Circuit has explained that, to qualify as an adverse employment action, "[a]n employee must experience materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm." *Douglas v. Preston*, 559 F.3d 549, 552 (D.C. Cir. 2009). While "false accusations without negative employment consequences" are not actionable adverse actions, *Stewart v. Evans*, 275 F.3d 1126, 1136 (D.C. Cir. 2002), disciplinary actions that result in suspensions without pay, as here, clearly constitute adverse employment actions, *Holbrook v. Reno*, 196 F.3d 255, 263 (D.C. Cir. 1999); *Saint-Jean v. District of Columbia*, 844 F. Supp. 2d 16, 21 (D.D.C. 2012).  Accordingly, the above-listed incidents—both of which involved suspensions without pay—fall within the universe of actionable adverse actions and can legitimately underlie Motley's claims.

As a result, and because Motley presents sufficient evidence from which a reasonable jury could conclude that those disciplinary actions were motivated by her gender, as already discussed, the Court finds that Motley states a *prima facie* case for gender discrimination. Although Defendants argue that these actions were based upon reasonable, non-discriminatory motives, Motley has come forward with sufficient evidence to survive summary judgment on the

---

[8]     Motley also identified the following incidents as "adverse actions" in her opposition briefing: (1) a 2003 adverse action for neglect of duty; (2) a July 2008 adverse action for neglect of duty; (3) a sub-par November 2008 performance evaluation; and (4) an April 2012 charge of discipline.  (Pl.'s Opp'n at ECF pp. 27-28).  But because Motley did not exhaust her claims with respect to these incidents through any of her charges to the EEOC, (*see* Dkt. Nos. 42-19, 42-20, 42-21, 42-22), they cannot form the basis for her gender discrimination or retaliation claims. *Morgan*, 536 U.S. at 122; *Baird*, 662 F.3d at 1251.

question of whether those explanations are pretextual and were instead motivated by some discriminatory animus against Motley as a female officer.

Therefore, Motley's gender discrimination claims against the District under Title VII (Count VI) and the DCHRA (Count VII) shall proceed, but shall be limited in scope to the July 2010 charge related to the boat incident and the September 2010 charge and "notice of termination" surrounding Motley's conduct in Superior Court.[9]  Further, insofar as the record establishes that Lt. Niepling initiated the investigation into the September 2010 charges that led to Motley's "notice of termination," her gender discrimination claim under the DCHRA against Lt. Niepling survives in this respect as well.  However, since Motley presents no evidence that either Asst. Chief Durham or Sgt. Poskus had any involvement in either of these incidents, her gender discrimination claims against those two individuals under the DCHRA will be dismissed.

Turning to Motley's retaliation claims, the Court finds that Motley fails to raise a genuine issue of material fact suggesting that those actions (or any of the other allegedly improper acts she attributes to Defendants) were motivated by retaliation for Motley having engaged in some type of protected activity.  In fact, she does not even identify the potentially "protected activity" that she claims incited a retaliatory motive on the part of Defendants.[10]  Instead, her opposition

---

[9]     Motley's gender discrimination claims shall also be limited in scope by the Court's earlier analysis concerning Defendants' timeliness challenges, including exhaustion under D.C. Code § 12-309 and the impact of the applicable statute(s) of limitation.  *See* Sections B.1–B.4, *supra*.  To this end, and as set forth in the Court's accompanying Order, the parties shall, along with their other meet and confer obligations prior to the pretrial conference, meet and confer regarding the appropriate scope of all of Motley's remaining claims, to identify the allegedly adverse actions the jury can properly consider in evaluating her various causes of action against the remaining defendants.

[10]    Based on the allegations in her Fourth Amended Complaint, the Court presumes that Motley would have relied on the charges of discrimination she filed with the EEOC and OHR as the underlying "protected activity" in support of her retaliation claims.  But Motley failed to include even a passing reference in her opposition briefing confirming as much.

briefing exclusively argues that Defendants actions were motivated by her gender—alleging that she was treated differently than her "male counterparts."  At most, she summarily asserts that "there is no basis for summary judgment on the discrimination and retaliation claims."  (Pl.'s Opp'n at ECF pp. 27-28).  But Motley fails to advance any substantive arguments, let alone arguments supported by competent evidence, as to how Defendants' alleged conduct was retaliatory.  As a result, the Court will dismiss Motley's retaliation claims under both Title VII (Count II) and the DCHRA (Count IV) as against all defendants.

### C.  Motley's IIED Claims (Count V)

As alleged in her Fourth Amended Complaint, Motley's IIED claims are expressly pled against the Officer Defendants—Asst. Chief Durham, Lt. Niepling, and Sgt. Poskus—and not against the District of Columbia.  (Dkt. No. 29 ("Fourth Am. Compl.") at ¶¶ 67-69 (Count V)).[11] But in seeking summary judgment, Defendants aver that "the District is entitled to judgment as a matter of law as to Plaintiff's IIED claim," arguing that Motley failed to provide adequate notice of an IIED claim to the Mayor of the District of Columbia, as required by D.C. Code § 12-309. (*See* Defs.' Mem. at 20) (emphasis added).  Other than this argument, Defendants do not assert that Motley's IIED claims fail on any other grounds—for example, by arguing that the underlying conduct was not sufficiently extreme or outrageous to sustain her claims.  Nor do Defendants advance any arguments whatsoever as to why Motley's IIED claims against the Officer Defendants should be dismissed.  But perhaps even more surprising is the fact that Motley did not point out the faults in Defendants' arguments in her opposition briefing; instead,

---

[11]     Moreover, looking back to Motley's First, Second and Third Amended Complaints, (Dkt. Nos. 10, 14, & 25), her IIED claims have always been pled against the Officer Defendants only, and not the District.   In fact, elsewhere in their Motion, Defendants expressly recognize as much. (*See* Defs.' Mem. at 4) ("Defendants Durham, Niepling and Poskus have been named as defendants as to Counts III, IV, V, VII and VIII.").

she essentially bought into their approach, arguing only that § 12-309 does not require the specificity that Defendants suggest, and that she was not required to explicitly reference an "IIED" claim in her letter to the Mayor.  Given all this, the briefing on Motley's IIED claims from both sides was unnecessary and unhelpful.  But at the end of the day, the fact remains that Defendants did not move for summary judgment in favor of the Officer Defendants.  However, the Court will dismiss Motley's IIED claim as against Asst. Chief Durham, given that Motley's underlying claims against Asst. Chief Durham—whether for hostile work environment, gender discrimination, or retaliation—cannot be sustained.[12]

### D.  Motley's Claims under 42 U.S.C. § 1983 (Count VIII)

42 U.S.C. § 1983 "provides for a damage action against 'any person who, under color of [the law] . . . of any State . . . or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.'"  *Parker v. District of Columbia*, 850 F.2d 708, 716 (D.C. Cir. 1988) (quoting 42 U.S.C. § 1983).  In this case, Motley's § 1983 claims are premised on her assertion that Defendants "have had a long standing, persistent policy at the Harbor Unit of favoring sworn male officers over female officers."  (Fourth Am. Compl. at ¶ 80).  She alleges that pursuant to this "policy," Defendants' "discriminatory and retaliatory treatment" toward her violated her rights under the Fifth Amendment to the Constitution.  (*Id.* at ¶ 81).

Dealing first with Motley's claim against the District of Columbia, a municipality cannot be held liable under § 1983 based on "principles of *respondeat superior*, but only for constitutional torts arising from 'action pursuant to official municipal policy.'"  *Triplett v.*

---

[12]     In addition, because Motley does not allege an IIED claim against the District of Columbia, the Court need not reach the issue of whether Motley's letter to the Mayor of D.C. satisfied the notice requirements of § 12-309 for purposes of an IIED claim.

*District of Columbia*, 108 F.3d 1450, 1453 (D.C. Cir. 1997) (quoting *Monell v. N.Y.C. Dep't v. Social Servs.*, 436 U.S. 658, 691 (1978)).  "The only acts that count (though they may include inaction giving rise to or endorsing a custom) are one by a person or persons who have 'final policymaking authority [under] state law.'"  *Id.* (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)).  As explained by our Circuit:

> There are a number of ways in which a "policy" can be set by a municipality to cause it to be liable under § 1983: [1] the explicit setting of a policy by the government that violates the Constitution;  [2] the action of a policy maker within the government;  [3] the adoption through a knowing failure to act by a policy maker of actions that are so consistent that they have become "custom"; or  [4] the failure of the government to respond to a need (for example, training of employees) in such a manner as to show "deliberate indifference" to the risk that not addressing the need will result in constitutional violations.

*Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003) (internal citations omitted). In seeking summary judgment in favor of the District, Defendants argue that, because the only "policy makers" for the Metropolitan Police Department are the Mayor of D.C. and the Chief of Police, and because neither of those individuals committed any of the acts about which Motley complains, she cannot establish liability under § 1983 on the part of the District.  (Defs.' Mem. at 37-40).  Defendants read the law too narrowly.  It is true that these facts would preclude liability under the first and second approaches outlined above, but Motley's claim is not grounded in either of those theories.  Instead, she seems to rely on the latter approaches, contending that Chief Lanier's inaction triggers liability on the part of the District.  Unfortunately for Motley, however, her claim fares no better on those grounds.

Instead, her opposition briefing simply contends, in purely conclusory fashion, that her supervisors' allegedly discriminatory actions "had become so widespread and embedded that Chief Lanier must have known and sanctioned it, especially given that her second in command is defendant Durham."  (Pl.'s Opp'n at ECF p. 29).  Other than this bald assertion, Motley provides

absolutely no evidentiary support in the record to implicate Chief Lanier or to otherwise demonstrate that the District's alleged conduct was driven by an official policy, as she must. FED. R. CIV. P. 56(c).   Nevertheless, based on the Court's own review, and when viewing the evidence in the light most favorable to Motley, as the Court must, the record demonstrates that, at most, Chief Lanier was aware of a single incident of potentially-unjustified disciplinary action against Motley.   After being cited for "Conduct Unbecoming" in late 2008, Motley appealed hat adverse action (which would have resulted in a 3-day suspension) to the Chief's office; ultimately, Chief Lanier rescinded the adverse action, and Motley suffered no disciplinary consequences as a result.   (*See* Dkt. No. 42-12 at ECF p. 1-2). Otherwise, Motley cannot point to any other evidence in the record to suggest that Chief Lanier knew about—let alone ignored—any other complaints or concerns raised by Motley about allegedly unjustified or discriminatory discipline.[13]   This one instance, without more, hardly establishes that Chief Lanier "knowingly ignored a practice that was consistent enough to constitute custom." *Jones v. Horne*, 634 F.3d 588, 601 (D.C. Cir. 2011); *Warren v. District of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004). Nor does it establish "deliberate indifference" on the part of the District, particularly given that Chief Lanier actually rescinded the only instance of discipline that appears to have come to her attention.   *Warren*, 353 F.3d at 39 ("Deliberate indifference . . . is determined by analyzing whether the municipality knew or should have known of the risk of constitutional violations, but did not act."); *Baker*, 326 F.3d at 1306.   Thus, because Motley failed to come forward with sufficient evidence to raise a genuine dispute as to whether a District custom or policy caused the

---

[13]     The Court observes that some of the other adverse actions and disciplinary notices that Motley received indicated that she had the option to appeal the decision to the Chief of Police's office.   But other than the single instance discussed above, Motley does not allege that she did so, nor is there any other indication in the record suggesting as much.

claimed violation of her constitutional rights, her § 1983 claim against the District will be dismissed.

Motley also advances § 1983 claims against the Officer Defendants, contending that their allegedly discriminatory conduct resulted in a violation of her due process and equal protection rights under the Fifth Amendment to the Constitution.  (Fourth Am. Compl. at ¶¶ 78-82).  In seeking summary judgment in favor of the Officer Defendants on these claims, the only argument mounted by Defendants is that Motley cannot establish the predicate constitutional violation to support her allegations.  (Defs.' Mem. at 37).  Put another way, and as summarized by Defendants' counsel during oral argument, Defendants argue that Motley's Title VII and DCHRA claims cannot form the underlying legal deprivation to sustain her § 1983 claims. However, Defendants interpret Motley's § 1983 claims too restrictively.  Motley does not rely solely on her statutory claims to form the basis of her § 1983 claims; she also alleges that the Officer Defendants' allegedly discriminatory conduct amounted to an independent and freestanding violation of her equal protection rights under the Constitution.  Thus, contrary to Defendants' argument, Motley's constitutional claims do not hinge entirely on her statutory claims, either under the DCHRA or Title VII.  *See Singletary v. District of Columbia*, 351 F.3d 519, 529-30 (D.C. Cir. 2003) (reversing dismissal of claim under § 1983 where district court failed to consider whether allegations of discrimination constituted a denial of equal protection, separate and apart from any potential violation of Title VII); *see also Hamilton v. District of Columbia*, 720 F. Supp. 2d 102, 110-12 (D.D.C. 2012) ("Because plaintiffs assert violations of their constitutional rights under the Fifth Amendment, their . . . § 1983 claims are unaffected by the avenues of relief set up by Title VII, including their failure to exhaust administrative remedies under Title VII.").  And given that the legal standards underlying constitutional

employment discrimination claims brought through § 1983 essentially parallel those of claims under the DCHRA and Title VII, *see, e.g.*, *Oates v. District of Columbia*, 824 F.2d 87, 90-91 (D.C. Cir. 1987), the Court concludes that Motley has come forward with sufficient evidence entitling her to present her claims to a jury.

As a final matter, Defendants contend that Motley's § 1983 claims are barred, at least in part, by the applicable statute of limitations. Our Circuit has held that § 1983 claims are governed by the residual three-year statute of limitations set forth in D.C. Code § 12-308(8). *Singletary*, 351 F.3d at 530 n.11; *Earle v. District of Columbia*, Case No. 11-7078, __ F.3d __, 2012 U.S. App. LEXIS 26550, at *12, 2012 WL 6720357, at *3 (D.C. Cir. Dec. 28, 2012). Motley concedes as much. However, as should be familiar by this point, Motley invokes *Morgan* and the continuing violation doctrine in an effort to salvage a greater portion of her claims under § 1983. (Pl.'s Opp'n at ECF p. 24). On this issue, neither Motley nor Defendants proffered authority that squarely addresses whether the continuing violation doctrine applies to § 1983 claims, and the D.C. Circuit recently declined to resolve this precise question. *Earle*, 2012 WL 6720357, at *4 ("We need not decide whether the continuing violation doctrine applies to section 1983 claims because Earle does not prevail under this theory, assuming *arguendo* it applies."). However, a number of other circuits have applied *Morgan's* reasoning to § 1983 claims,[14] as have several other judges in this District. *Jones v. District of Columbia*, 879 F. Supp. 2d 69, 82-83 (D.D.C. 2012) (Collyer, J.); *Turner v. District of Columbia*, 383 F. Supp. 2d 157, 168 (D.D.C. 2005) (Urbina, J.). Based on the reasoning espoused in those cases, this Court

---

[14]    *See Ayala-Sepulveda v. Municipality of San German*, 671 F.3d 24, 30 n.6 (1st Cir. 2012); *O'Connor v. City of Newark*, 440 F.3d 125, 127-29 (3d Cir. 2006); *Sharpe v. Cureton*, 319 F.3d 259, 267-68 (6th Cir. 2003); *Hildebrandt v. Ill. Dep't of Natural Res.*, 347 F.3d 1014, 1036 n.18 (7th Cir. 2003); *Carpinteria Valley Farms, Ltd. v. Cnty. of Santa Barbara*, 344 F.3d 822, 829 (9th Cir. 2003).

joins with the First, Third, Sixth, Seventh, and Ninth Circuits—along with other Judges on this bench—in concluding that the reasoning of *Morgan* and its progeny applies to claims under § 1983.  Thus, all discrete acts that Motley alleges occurred prior to March 26, 2006—more than three years before she initiated this action—are time-barred and cannot support her § 1983 claim under a traditional discrimination analysis.  However, to the extent Motley argues that Defendants' creation of a hostile work environment through a pattern of discriminatory discipline violated her constitutional rights, she may properly rely on disciplinary acts that fall outside of the limitations period in pursuing this theory against the Officer Defendants.

Finally, while Motley's § 1983 claims against Lt. Niepling and Sgt. Poskus survive, the Court will dismiss Motley's § 1983 claim against Asst. Chief Durham in keeping with its earlier analysis.  Simply stated, Motley fails to raise a triable issue of fact from which a jury could conclude that Asst. Chief Durham discriminated against her on the basis of her gender—whether in the form of a discrete discriminatory act or through the alleged creation of a hostile work environment.  That claim will therefore be dismissed.

## CONCLUSION

For the foregoing reasons, the Court concludes that Defendants' Motion for Summary Judgment must be **GRANTED IN PART** and **DENIED IN PART**.  An appropriate Order accompanies this Memorandum Opinion.

Date:  February 14, 2013

_____
ROBERT L. WILKINS
United States District Judge